## IN RE APPLICATION OF FRED F. MASON TO THE HONORABLE J. A. A. BURNQUIST, GOVERNOR OF THE STATE OF MINNESOTA, FOR THE REMOVAL OF WILLIAM M. NASH, COUNTY ATTORNEY OF HENNEPIN COUNTY.[1]

December 17, 1920.

No. 22,065.

**Certiorari—review of action of Governor in removal of officer.**

1. While the courts cannot interfere with the exercise of the powers which the Constitution vests in the Governor, his action in removing an officer from office may be reviewed by writ of certiorari, as that power rests only on an act of the legislature.

**Amendment of petition for removal of officer.**

2. The Governor may permit the petition for the removal of an officer to be amended by inserting additional charges therein, if the officer be given proper opportunity to meet such additional charges.

**Rules of evidence relaxed—no reversal if decision is supported by competent evidence.**

3. Such proceedings are not governed by the strict rules which govern

[1]Reported in 181 N. W. 570.

trials in court, and a decision supported by competent and relevant evidence cannot be reversed because other incompetent evidence may have been received.

### Removal of officer—proceedings not penal.

4. Proceedings for amotion from office are authorized for the good of the public service, not as a punishment of the officer, and are remedial rather than penal in their nature.

### Certiorari—examination of evidence limited.

5. The evidence may be examined, under a writ of certiorari, only for the purpose of ascertaining whether it furnished any reasonable or substantial basis for the decision. The record contains competent evidence supporting the decision, and whether it should be taken as true, or rejected as false, was for the tribunal vested with the power of amotion to determine.

### Removal of officer—uncorroborated evidence of accomplice.

6. The rule that a defendant cannot be convicted in a criminal prosecution on the uncorroborated testimony of an accomplice, does not apply in such a proceeding as this, yet such testimony should be carefully scrutinized.

### Evidence of other offenses admissible.

7. Proof of other offenses, of the same nature as those charged, which tended to show a general course of conduct which embraced the commission of such offenses, was admissible for the purpose of corroboration.

### Indictment and acquittal of Federal charge not a bar to state proceeding.

8. The fact that the relator had been indicted, tried and acquitted in a Federal court, on one of the charges set forth in the petition, did not bar the Governor from hearing and determining that charge in this proceeding.

Upon the relation of William M. Nash the supreme court granted its writ of certiorari directed to the Honorable J. A. A. Burnquist, Governor of the state of Minnesota, to review his action in removing William M. Nash, county attorney of Hennepin county, from office. Writ discharged.

*M. H. Boutelle* and *Fowler, Schmitt, Carlson & Furber,* for relator.

*Albert F. Pratt,* Assistant Attorney General, for respondent.

TAYLOR, C.

The relator was county attorney of Hennepin county for the term beginning on the first Monday in January, 1919. On May 17, 1920, one Fred M. Mason petitioned the Governor to remove him from office, on the ground that he had been guilty of malfeasance in the performance of his official duties. After an extended hearing, at which much evidence was submitted, the Governor found the charges true, and made an order removing him from the office of county attorney. The relator sued out a writ of certiorari from this court.

The courts can in no way interfere with the exercise of the powers which the Constitution vests in the Governor as chief executive officer of the state, but the power of amotion from office is not given him by the Constitution, but rests only on an act of the legislature, and it is settled in this state that his action in removing an officer from office may be reviewed by a writ of certiorari. State v. Eberhart, 116 Minn. 313, 133 N. W. 857, 39 L.R.A.(N.S.) 788, Ann. Cas. 1913B, 785, in which the prior decisions are reviewed and analyzed. In that case the removal of a county attorney from office was sustained, the court saying:

"The decision will not be reversed if there is any evidence of a legal and substantial basis reasonably tending to support it."

In the present case the original petition charged, in paragraph 2, that the relator had received bribes from one Michael Weisman under an agreement to use his official position to protect certain persons in the commission of certain crimes without specifying either the persons or the crimes, and then charged, in paragraph 3, that pursuant to the receipt of such bribes he had wilfully and feloniously conspired with Oscar Martinson, Michael Weisman and 11 other persons named therein to receive, transport and conceal a large quantity of intoxicating liquor unlawfully imported into this state from the Dominion of Canada, and for fuller details referred to a complaint made to a United States commissioner, charging him with this offense, a copy of which was attached to the petition. At the opening of the proceedings on the second day of the hearing, the petitioner was permitted to amend the petition by inserting two additional paragraphs therein: One to the effect that, on or about January 15, 1920, the relator had received a bribe of

147 M.—25.

$500 from Michael Weisman to use his official position to prevent one Max Brooks from being brought to trial upon an indictment which had been returned against him by the grand jury of Hennepin county; the other to the effect that, on September 3, 1919, he had received from Weisman the sum of $2,000 as the consideration for using his official position to bring about the imposition of a fine, without a prison sentence, upon four women named therein who had been indicted for keeping houses of ill-fame in the city of Minneapolis.

The principal contentions of the relator are: (1) That the petition could not be amended by inserting additional charges therein after the hearing had been begun; (2) that the findings are manifestly and palpably against the preponderance of the evidence; (3) that evidence of other offenses than those charged in the petition was improperly received.

1. The statute provides that the Governor may remove from office any county attorney, or any of certain other specified officers,

"Whenever it appears to him, by competent evidence, that either has been guilty of malfeasance or nonfeasance in the performance of his official duties; first giving to such officer a copy of the charges against him, and an opportunity to be heard in his defense." G. S. 1913, § 5724.

The next section provides for the appointment of a commissioner to take and report the testimony, and that each witness shall subscribe his name to his testimony when the same is reduced to writing. In the present case a commissioner was appointed who took down and made a record of the testimony, but the testimony was taken before the Governor in person and the various rulings throughout the hearing were made by the Governor. It will be observed that the statute does not limit the time nor prescribe the manner in which charges shall be presented, but merely provides that the accused officer shall be furnished a copy of the charges and be afforded an opportunity to make his defense. This requires a hearing, the purpose of which is to determine whether the officer has been guilty of the alleged misconduct. The Governor, upon whom the statute imposes the duty to determine this question, is not a court, and is not bound by the strict rules which govern trials in court. State v. Common Council of City of Duluth, 53 Minn. 238, 55 N. W.

118, 39 Am. St. 595; State v. McGaarden, 85 Minn. 41, 88 N. W. 412, 89 Am. St. 534; State v. Eberhart, 116 Minn. 313, 133 N. W. 857, 39 L.R.A.(N.S.) 788, Ann. Cas. 1913B, 785. The statute is remedial rather than penal in its nature; it provides for the removal of an unfaithful officer to protect the public, secure the faithful performance of official duties, and keep the public service above reproach, not to punish the officer for his derelictions. 22 R. C. L. 573, § 284; Territory v. Sanches, 14 N. M. 493, 94 Pac. 954, and note appended to report of case in 20 Ann. Cas. 109; also note found in 135 Am. St. 250. The restrictions which hedge about a trial in court on an indictment and limit the power to amend the indictment do not apply, and we find no warrant in the statute for saying that only one charge or set of charges may be considered, and see no reason why additional charges may not be presented, either independently of the original charges, or by way of amendment to them. The question to be determined is whether the accused officer has so misconducted himself in respect to the performance of his official duties that the good of the public service requires his removal from office. And the officer, or special tribunal, charged with the duty to determine this question may, in our opinion, in the proper exercise of his discretion permit the presentation of further and additional charges setting forth facts which, if true, have a direct and material bearing upon the question to be determined. Of course, the accused officer must be given a proper opportunity to meet the additional charges after they have been furnished to him. In the present case, the relator was given ample opportunity to present all his evidence and make a full defense.

2. The Governor found three charges true, namely: That the relator was a party to the so-called liquor conspiracy; that he had received a bribe in the Max Brooks case; and that he had received a bribe in the cases of the four women indicted for keeping houses of ill-fame. Any one of these findings, if sustained by the evidence, furnished a sufficient ground for the order of amotion. The relator does not claim that there is no evidence to support these findings, and could not well do so, for the witness, Michael Weisman, testified directly and positively that he made the arrangement with the relator in each of these instances, and paid

him $500 on behalf of Max Brooks, $2,000 on behalf of the four women, and $2,000 on behalf of the parties who were illegally bringing liquor from Canada into Minneapolis. The relator's contention is that the findings rest on the testimony of Weisman, and that Weisman was impeached and discredited to such an extent that his testimony should be rejected as unworthy of belief.

The province of this court in reviewing proceedings brought before it by writ of certiorari is well defined. It may examine the evidence, but only for the purpose of ascertaining whether it furnished any reasonable or substantial basis for the decision. It cannot reweigh the evidence for the purpose of determining where the preponderance lies, nor substitute its judgment as to the credibleness of the testimony of a witness for that of the tribunal charged with the duty of determining the facts. State v. City of Duluth, 125 Minn. 425, 147 N. W. 820; State v. Common Council of City of Duluth, 53 Minn. 238, 55 N. W. 118, 39 Am. St. 595; State v. Dart, 57 Minn. 261, 59 N. W. 190; State v. Eberhart, 116 Minn. 313, 133 N. W. 857, 39 L.R.A.(N.S.) 788, Ann. Cas. 1913B, 785; 5 R. C. L. title Certiorari, §§ 3, 14, 16; McNiff v. City of Waterbury, 82 Conn. 43, 72 Atl. 572, and note appended to report of that case in 135 Am. St. 247.

The relator points out several particulars in which the testimony of Weisman does not accord with that of other witnesses, and also points out various facts tending to discredit him and tending to show the improbability of portions of his testimony, as well as the fact that he admits that his testimony squarely contradicts his previous statements, but these were matters to be taken into account by the trial tribunal in weighing his testimony, and will not warrant this court in saying that his testimony should have been rejected. According to his own story, Weisman was an accomplice in the different crimes to which he testified, but the rule, requiring the testimony of an accomplice to be corroborated, is statutory and does not extend to such a proceeding as this. Nevertheless the fact that a witness is an accomplice is sufficient reason for scrutinizing his testimony closely, and the Governor undoubtedly scrutinized Weisman's testimony closely, for he calls attention in his findings to various facts and circumstances, shown by other

evidence, which corroborated that testimony. In saying that the rule requiring an accomplice to be corroborated does not apply to this proceeding, we are not to be understood as intimating that Weisman's testimony was uncorroborated, for the record discloses several corroborative facts and circumstances, of which the following are examples:

From the testimony of Assistant District Attorney Anderson, it appears that on the day before Martinson's arrest relator asked Anderson over the telephone whether Special Agent Campbell was investigating Martinson's doings, and was informed that Anderson did not know; that about seven o'clock that evening Anderson told relator over the telephone that "there is something very important in the air;" that relator asked: "Has it gone too far to be headed off?" that Anderson replied: "Have Oscar Martinson in my office at nine o'clock in the morning and we will go over it;" that about an hour later relator and Martinson came to Anderson's home where relator, after saying: "This has got to be stopped," asked Anderson to tell them what could be done and whether there was any way to reach or influence District Attorney Jacques or Special Agent Campbell; that Anderson assured them that Jacques and Campbell could not be swerved from doing their duty, but would make no arrests without good cause, and suggested that relator and Martinson have an interview with Campbell for the purpose of convincing him that there was nothing to the matter he was investigating; that they arranged to meet Campbell at Anderson's office at nine o'clock the next morning, and that after Martinson left the room relator stepped back and asked again what it was about, to which Anderson replied: "I don't know, unless it is some whiskey proposition." It is conceded that they did not appear at Anderson's office the next morning, but went together to the office of an attorney at or about the time set for the meeting with Campbell, and that Martinson was arrested shortly thereafter for complicity in the liquor conspiracy and subsequently pleaded guilty to the charge. The relator admitted the interviews with Anderson, but claimed that he was merely trying to help Martinson and had no knowledge that the matter concerned himself personally.

From the testimony of Martinson it appears that, after learning that the grand jury proposed to investigate the sheriff's office and the county

attorney's office, he and the relator went to a judge of the district court and asked him to remove a certain grand juror from the panel. Relator denies this. The judge testified that the relator and Martinson came to him in reference to one of the grand jurymen about March 15, 1920, and that "the conversation had reference to a claim, at least, that some of the grand jurymen wanted to investigate both the county attorney's office and the sheriff's office." In view of the circumstances, we think that the testimony as to the active efforts of the relator to "head off" these investigations had corroborative force. While Martinson unreservedly admitted his own part in the transaction, his testimony gives the impression that he wished to avoid disclosing facts which affected others, and is not explicit as to several matters, yet we think his testimony, taken as a whole, has corroborative value.

A careful examination of the record satisfies us that there is substantial evidence supporting the decision, and we cannot review the evidence for the purpose of ascertaining whether we would draw the same conclusions from it that were drawn by the tribunal appointed by law to determine the truth or falsity of the charges.

3. Proof of other offenses of the same nature as the offenses charged, and which tend to show that the defendant was pursuing a general scheme or course of conduct which embraced the commission of such offenses, is admissible for purposes of corroboration even in criminal trials. State v. Wilson, 72 Minn. 522, 75 N. W. 715; State v. Ames, 90 Minn. 183, 96 N. W. 330; State v. Monroe, 142 Minn. 394, 172 N. W. 313; State v. Whipple, 143 Minn. 403, 173 N. W. 801; State v. Ettenberg, 145 Minn. 39, 176 N. W. 171.

The other offenses which the petitioner sought to prove, in the present proceeding, were all of the same nature as those charged in the petition, and proof of them was admissible, under the above rule, for the purpose of showing that the offenses charged were part of a general course of conduct. As the decision is not predicated upon these other offenses, there is no occasion to consider them further. It may be that the rule against hearsay, if strictly enforced, would have excluded some of the evidence received, but, in such proceedings, the Governor is not bound to enforce the technical rules of evidence, and his decision cannot be

reversed because incompetent or irrelevant evidence was received, if it is sufficiently supported by other competent and relevant evidence.

4. The relator, the sheriff, Weisman and nine or ten others were indicted in the Federal court for the so-called liquor conspiracy. The sheriff, Weisman and some others entered a plea of guilty. The relator stood trial and was acquitted by the jury. That such a conspiracy existed, and that large quantities of intoxicating liquor were brought into the city of Minneapolis in violation of law is beyond dispute, but the relator has at all times stoutly asserted, not only that he was not a party to it, but that he had no knowledge of it. He now urges, in effect, that his acquittal in the Federal court exonerated him from this charge, and that this charge ought not to have been considered in reaching a decision in the present proceeding. The prosecution in the Federal court was for an alleged violation of a Federal law, and the judgment there rendered would not bar a prosecution in a state court for the violation of a state law, although based on the same act. State v. Holm, 139 Minn. 267, 166 N. W. 181, L.R.A. 1918C, 304, and cases cited therein. Furthermore this proceeding is not a criminal prosecution, but an investigation authorized by statute to determine whether the relator has been guilty of misconduct warranting his removal from office, and, even if the acquittal had been in a state court, it would not have closed the door to such an investigation. The indictment alleged a violation of the criminal laws, this petition alleges a violation of his duties as a public officer. The offenses are not the same, even if predicated on the same act, and neither proceeding can operate as a bar to the other. See 8 R. C. L. title Criminal Law, §§ 116, 118, 128, 135, 136. See also State v. Lee, 29 Minn. 445, 13 N. W. 913; State v. Harris, 50 Minn. 128, 52 N. W. 387, 531; City of Virginia v. Erickson, 141 Minn. 21, 168 N. W. 821. While these cases were of a different nature, the reasoning in the decisions applies with greater force to such a case as the present.

It follows from what we have said that the writ must be and is discharged.

HOLT, J. (concurring).

I find no corroboration of Mike Weisman worthy of consideration showing either that Nash was a party to the whiskey conspiracy or that

he knew that Martinson was implicated therein. The testimony given by Anderson, referred to in the opinion, may be consistent with Nash's innocence of any connection with the deal, and explainable by the natural desire of one county official to assist another whom he believes to be wrongfully accused. As to the other charges of which Nash was found guilty, there is no shadow of corroboration. But I concur in the result, on the ground that the Governor was free to believe or disbelieve Weisman, even though upon some matters of the most vital importance he was conclusively shown to be a wilful falsifier.

QUINN, J. (dissenting).

I dissent. The removal statute provides that the Governor may remove from office any county attorney whenever it appears to him by competent evidence that such officer has been guilty of malfeasance or nonfeasance in the performance of his official duties. The proceedings are judicial in their nature and may be reviewed on certiorari: First, to see whether the removing power had jurisdiction and kept within it; second, whether the charges were sufficient in law; and third, whether the evidence furnished a legal and substantial basis for the removal. State v. Common Council of City of Duluth, 53 Minn. 238, 55 N. W. 118, 39 Am. St. 395. To hold otherwise is not only to reverse our former decisions, but to ascribe to the Executive arbitrary power at variance with our American institutions and spirit. We see no reason why the executive power of removal, involving as it does quasi judicial functions, should not, within the limits stated, be subject to review in the same manner as judgments of courts in general. For every wrong there is a remedy, and if this relator has suffered wrong there must be some method of review, and certiorari, it seems, is the remedy.

It is well settled by the decisions that removal proceedings of the character of those under review, are highly penal in their nature and governed by the rules of law applicable to criminal prosecutions. State v. Hasty, 184 Ala. 121, 63 South. 559, 50 L.R.A.(N.S.) 553, Ann. Cas. 1916B, 703. They are of a quasi judicial character and must insure a fair trial. Hawkins v. Common Council of City of Grand Rapids, 192 Mich. 276, 158 N. W. 953, Ann. Cas. 1917E, 700. They are properly held to be governed by the constitutional guarantees and statutory pro-

visions governing criminal proceedings in general. Daugherty v. Nagel, 28 Idaho, 302, 154 Pac. 375; Thruston v. Clark, 107 Cal. 285, 40 Pac. 435; State v. District Court Silver Bow County, 44 Mont. 318, 119 Pac. 1103, Ann. Cas. 1913B, 396.

Competent evidence, as used in the statute, means evidence legally sufficient, that is, legal in quality. This court will examine the evidence, not for the purpose of weighing it, but to ascertain whether it furnished any legal and substantial basis for the removal. State v. Common Council of City of Duluth, supra.

The principal finding on which the order of removal is based, is the alleged complicity of relator in a conspiracy to import intoxicants into this state. The conspiracy is claimed to have been participated in by relator, one Weisman, Martinson (at the time sheriff of Hennepin county) and 13 other persons, whose names it is unnecessary to mention. Participation of relator consists, it is alleged, of an agreement on his part to remain in his office at night during the unloading of various cars of liquor shipped from Canada, in order that he might see that persons participating in the unloading, if arrested, were promptly released on bail; that in consideration for such promise he was paid at various times large sums of money by Weisman. Weisman is the only witness who testified to such arrangement or to the payment of any money. Martinson was examined as a witness, but his testimony is so confused and contradictory that it cannot be made the basis of credibility. None of the other 13 alleged conspirators were called. Weisman and Martinson are acknowledged accomplices with relator, but their testimony stands wholly uncorroborated. It is the rule in this state (G. S. 1913, § 8463), and has been since territorial days, that a conviction for crime cannot be sustained on the testimony of an accomplice, unless corroborated by such other evidence as tends to convict the accused of the commission of the offense. The corroboration is not sufficient where it merely shows the commission of the offense or the circumstances thereof. I am convinced, in view of the long settled policy of our law, that the expressions "competent evidence" and "legal and substantial basis for action" require a holding that in cases of this character there must be some corroboration of accomplices.

A brief review of the testimony of Weisman will clearly demonstrate that it not only stands uncorroborated, but is so manifestly false and unworthy of credit as to lose entirely the character of competent proof, and constitutes no legal and substantial basis for the removal. The pertinent testimony given by Weisman is in effect as follows:

1. That the first car came in around Christmas; that, as soon as he was advised by Banks (another conspirator) that it was unloaded, he paid relator $1,000; that he got the currency from his safety deposit box at the bank; that the bank records showed the visit. To corroborate this story the bank vault records were produced showing a visit by Weisman to the vault on December 26, 1919. This testimony was completely destroyed by the record evidence from the railroad company, showing that the car did not arrive at St. Paul until December 29, and did not reach Minneapolis until December 31, and was not unloaded until January 1 or 2.

2. That the second car came during the first week after Christmas; that the day after it was unloaded he paid to relator $1,000; that he paid the money the first week after Christmas. He first testified that he got the money from one Goldberg and a Canadian fellow, after which he testified that he got it from one Posnick (another conspirator); that it was from the proceeds of the sale of the first car, part of which had been sold a couple of days after its arrival. It was proven that this second car did not arrive at Minneapolis until January 6, 1920; that it was not unloaded until January 7. The money could not, therefore, have been paid the first week after Christmas, nor could $1,000, paid the first week after Christmas, have been derived from the proceeds of the sale of the first car, for the first car was not unloaded until January 1 or 2, and no sales were made according to the witness' testimony for a couple of days thereafter. Posnick was not called as a witness.

3. That the third car came to St. Paul on January 12; that the next morning he saw in the public press that a man had been killed in connection with the unloading; that he took the paper to the relator's office on the morning of the thirteenth, showed him the article and upbraided him for not fixing things in St. Paul; that the relator then called up Mr. Dickey, Assistant United States Attorney, in St. Paul, and ar-

ranged to go to St. Paul to have lunch with him; that he went between 9 and 10 o'clock in the morning; that the relator returned about 1:30, and told witness that Dickey wanted $1,000; that witness then went to his deposit box and got the currency and gave it to relator; that he gave the money to relator in the grand jury room at about two o'clock on January 13. On cross-examination the witness, with unusual certainty as to date, repeated this testimony. The bank records were then produced, showing a visit by Weisman to his box at 2:05 p. m. January 13. But this story was completely destroyed by the record proof that the third car was switched to St. Paul so as to arrive there on January 13, and did not arrive at Minneapolis until January 16. It was also shown by witnesses and by a copy of the Press, that the incident of the man being killed did not occur until 2:45 on the morning of January 14. It was also shown by record evidence that the relator was in the company of Mr. Palmer, Assistant Attorney General, the entire day of January 13, except a short time while presenting a case to the grand jury, that body being in session in its room at the very time Weisman claimed to have paid relator the money therein.

4. That the fourth car he knew nothing about, except that Banks told him relator had got part of the contents of the car. Banks was not called as a witness, which leaves this testimony purely hearsay.

Corroboration of Weisman's testimony is found by the Governor, in the fact that relator made a visit to Mr. Dickey at St. Paul, on January 15, but this was not the thirteenth, and at that time the trial of a criminal case was in progress by the assistants in relator's office, in which Weisman was the principal witness. The relator testifies that, at the request of his assistant who was trying the criminal case, he went to St. Paul to ask Mr. Dickey to defer the arrest of Weisman until after the criminal case then on trial was submitted to the jury. This testimony is supported by the Assistant County Attorney, Floyd B. Olson, and by Mr. Dickey. It is significant that Mr. Reinardy, who testified to seeing Mr. Nash at the office of Mr. Dickey, was told by Mr. Dickey at the time that a trial was going on at Minneapolis in which Weisman was the principal witness, and that Mr. Nash was there to see him about holding up the arrest of Weisman until the case was com-

pleted. Martinson also testified that Mr. Nash went to St. Paul upon this occasion to see Mr. Dickey in regard to deferring the arrest of Weisman. The Governor seems to find corroboration in the fact that, just prior to Martinson's arrest for complicity in the liquor conspiracy, relator went with Martinson to Anderson, another Assistant District Attorney at St. Paul, and held a conversation with him. Relator explains this visit by saying that Martinson came to him as a friend and fellow officer, and told him that the United States District Attorney was making an investigation of his office in regard to a matter of fines collected by Martinson and an impertinent letter written by Martinson to the District Attorney. That Martinson desired relator to go to St. Paul and see if the matter could not be explained. In this relator is corroborated by Martinson. Martinson says that the talk with Mr. Anderson was concerning fines and an impertinent letter. Mr. Anderson testified that the matter of fines was the subject of conversation between relator, Martinson and himself, and that it was not until Martinson had left the room that he told relator that he thought the investigation was in regard to some whiskey affair. I see nothing about the two trips to St. Paul inconsistent with the innocence of the relator. His conduct upon both occasions indicates that he knew nothing of Weisman's and Martinson's complicity in the whiskey conspiracy. If Weisman's testimony is false, then the St. Paul visits are devoid of any corroborative effect.

5. The next charge on which the Executive grounds the removal is the so-called Ross case. Weisman testified, and his testimony is supported by that of one Chesnut, attorney for Ross, that in April or May, 1919, Ross was under indictment, charged with stealing an automobile, and that the indictment was nolled by the relator. Weisman testified that $1,300 was collected at the National Hotel and, in the presence of one Murphy, the clerk, counted out to him, Weisman, and that he paid it to the relator on the day following the dismissal of the Ross case. This testimony is without corroboration, and it was shown by the records that Ross was never indicted, that the grand jury reported no bill against him. The clerk, Murphy, at the hotel, testified that no such thing as related ever occurred at the hotel.

6. The next relates to the Max Brooks affair. Weisman testified that, some time after New Year's, he received from Brooks, then under arrest for swindling, the sum of $500; that he arranged with one "Jim Nash" that the case was to be put off from time to time until finally dismissed; that he saw one Hughes, attorney for Brooks, and arranged with him for a dismissal of the case. It was conclusively shown that Brooks was turned over to Wisconsin authorities, convicted and in prison at the time of the hearing, and that his case in Hennepin county is still pending with Weisman on his bond, though Weisman testified with much positiveness, that he never signed a bond for Brooks. Mr. Hughes was called to corroborate Weisman, but instead he testified that he never saw Weisman until the time of the hearing in the Governor's office.

7. The next charge relates to the prosecution of four women for conducting houses of ill-fame; from these women Weisman claims that he collected $500 each, and that he paid the same to the relator to let them off easy; that he paid it to relator in the office of John P. Nash, going from the immediate presence of Franklin C. Jones, who was a member of the grand jury; that the subject of his conversation with Jones was the purchase of some land near Lake George in Anoka county. Mr. Jones was called and testified that there was no such occasion, and that he had not talked with Weisman about Lake George property since 1917. The attorney for the women was called by the prosecution, but he testified that the county attorney's office made no recommendation in the matter.

It is manifest that the showing on behalf of the prosecution in this proceeding is totally lacking in credibility. There can be no inference drawn but that it was deliberately false. I am unable to understand how such testimony given by the principal witness can be converted into truth by proving a few isolated facts consistent with such falsehoods. Turning to the side of justice. The charges as to relator's complicity in the liquor conspiracy were fully tried in the Federal court, under a prosecution by the United States District Attorney, and the jury there, as in my opinion it would be compelled to do here, returned a verdict of acquittal. No other verdict could stand.

While this court will not apply to proceedings of this character the strict rules of evidence pertaining to the trial of causes in court, still

competent evidence is required. It is not necessary to point out the many flagrant errors involving violations of the most elementary rules of evidence. Among these are the almost numberless infractions of the rule against hearsay testimony. It can hardly be said that such evidence was without effect, for the Executive, by his rulings, asserted its admissibility, and we must assume that it was deemed material and entered into the final conclusions arrived at. Proceedings of this character are initiated by formal charges; it is not open to question but that at times the proofs may extend beyond the scope of the charges, but it seems so certain, in this case, they so far transcend the charges that the result should not have our affirmance. I am of the opinion that the findings are unsupported by competent evidence and that the record fails to disclose any legal and substantial basis for the removal. The findings should be set aside.