STATE EX REL. JOHN G. ROCKWELL v. STATE BOARD OF EDUCATION AND OTHERS.[1]

November 6, 1942.

No. 33,143.

[1]Reported in 6 N. W. (2d) 251.

*Drake & Drake,* for relator.
*Pierce Butler, Jr.,* for respondents.

STREISSGUTH, JUSTICE.

In 1934 the relator, John G. Rockwell, was appointed commissioner of education to complete the term of a predecessor expiring August 1, 1937. Upon the expiration of that term, relator was re-

appointed for a statutory six-year term ending August 1, 1943. Both appointments were made by the state board of education, hereinafter referred to as the board, pursuant to Minn. St. 1941, § 120.05 (Mason St. 1927, § 2961).

On November 30, 1940, the board ordered relator's suspension from office, by resolution, as follows:

"Be it resolved that the Board find from the minutes of this Board for the last six months and from Commissioner Rockwell's actions in the Carstater removal matter and in his opposition to the appointment of Harry Schmidt and Clarence E. Funk, that Commissioner Rockwell has been inefficient and guilty of actions inconsistent with the duties of his office, and that he is hereby suspended for a period of thirty (30) days, and that he be given the right to be heard on said charges and the question of his permanent removal be considered at a meeting of this Board, at 1:30 P. M., December 26, 1940."

On December 18, 1940, the board adopted a further resolution "that the State Board of Education at the next meeting, to be held December 26, 1940, should consider all matters pertaining to actions of John G. Rockwell during his term as Commissioner of Education, and also matters pertaining as to his fitness and qualifications for such position."

On December 26, 1940, the date specified in said resolutions, a public hearing before the board was begun, M. Tedd Evans, assistant attorney general, appearing as attorney for the board. A large group of relator's friends had previously assembled in the meeting room. Through their spokesmen, they immediately challenged the authority of the board to "come in here and take possession of this citizens' meeting," insisting that the meeting was not a meeting of the board but a mass meeting to protest the actions of the board "from the floor." Then followed numerous remarks and calls from the audience, causing the chairman of the board to announce: "If this is going to continue, if we can't have an orderly meeting, the board will have to adjourn to another room and hold

their meeting. You may stay here and hold a meeting of your own."

At this point, relator's counsel intervened and pleaded with friends of relator for an orderly meeting. Decorum being reëstablished, the meeting proceeded and testimony was taken, though not without further interruptions from the floor. During the progress of the hearing, relator's counsel again admonished "friends of Dr. Rockwell to refrain from taking any steps which would interrupt or interfere with such orderly procedure," but without success. To quote relator's counsel, "We proceeded to adduce evidence until the whole thing broke up in a sort of row."

The following day the board reconvened. In the interim, a conference had been held in the governor's office, at the governor's request, at which the board, the attorney general, and relator were represented, and at which the events of the preceding day were discussed. The governor had suggested that the board abandon its attempt to hold a hearing, and instead appoint a referee and engage its own attorney. To quote from the statement of relator's counsel to the referee: "We were called over to the governor's office. The governor had had an observer here at that meeting, * * * and the governor suggested that the board abandon its attempt to hold a hearing, appoint a referee and engage an attorney."

Accordingly, when the board met on December 27, it did not attempt to receive any more evidence but announced the appointment of Daniel F. Foley, a practicing attorney of Minneapolis, as referee, and Pierce Butler, Jr. of St. Paul as attorney for the board. A formal resolution ratifying the two appointments and specifically authorizing the referee "to receive and file pleadings or amendments thereto" was adopted by the board on January 10, 1941. A question having arisen during subsequent proceedings as to Mr. Butler's right to appear without the consent of the attorney general of the state, the referee offered to and did procure and read into the record a statement from the assistant attorney general "that he and Mr. Butler were appearing together for the state

board of education." With this explanation, relator's counsel stated that such arrangement was "perfectly satisfactory" to him and his client.

This preliminary history is given at length as bearing upon the necessity for a reference and the propriety of the appointment of special counsel, to which we shall presently refer.

From January 13 continuously to March 11, 1941, hearings were conducted before the referee so appointed, the board being represented thereat by its special counsel. No member of the board took any official part in the subsequent hearings, nor did any representative of the attorney general's office appear thereat. Seven general charges were served upon relator on January 14 involving accusations of inefficiency and misconduct. During the progress of the hearing, new charges and additional specifications of old charges were added from time to time by amendment. Testimony given at the hearing was taken down by a shorthand reporter who thereafter made a transcript thereof. Upon the completion of the transcript, briefs were prepared and submitted to the board both by counsel for the relator and for the respondent.

On September 26, 1941, the board made and filed findings of fact adjudging relator guilty of inefficiency and numerous acts of misconduct, together with certain conclusions of law of similar import, and an order forthwith dismissing relator from his office and from the employment of the department of education as of November 30, 1940, the date of his original suspension.

The transcript of testimony comprises 3,675 pages submitted to us in typewritten form. In addition, approximately 228 exhibits, ranging in length from single sheet memoranda to full-sized volumes, were offered in evidence. Notwithstanding the herculean task involved, we have carefully examined this voluminous record with a view to determining whether the board possessed the legal right to suspend and dismiss relator, and, if so, whether this power was properly exercised and relator given a fair hearing. Our work in this respect has been considerably lightened by the complete summary of the testimony contained in relator's brief.

We shall not attempt to give a detailed statement of facts relative to each of the charges and findings made, but shall, during the course of our opinion, refer with particularity to numerous charges and findings which, considered alone or in conjunction with others, are or are not sufficient to justify the board's order of dismissal.

■ Relator at the outset challenges the power of the board to suspend, dismiss, or remove him as state commissioner of education upon any ground, his term being fixed by statute.

Except for the fact that Mason St. 1927, § 2969, expressly granting such power, was expressly repealed by L. 1941, c. 169, art. XIV, p. 362 (a fact which has been entirely overlooked by both counsel), our problem would be simple. In the face of the clear and unequivocal language of § 2969, no court could engraft upon the statute an exception or saving clause making it inapplicable to officials appointed for a fixed term. To do so, under the guise of interpretation, would be equivalent to writing words of limitation into an otherwise unambiguous statute, a power no court possesses, however skilled it may be in the art of judicial legislation. 6 Dunnell, Dig. & Supp. § 8938; Sandwich Mfg. Co. v. Zellmer, 48 Minn. 408, 51 N. W. 379; Gullings v. State Board of Dental Examiners, 200 Minn. 115, 273 N. W. 703; Peterson v. Halvorson, 200 Minn. 253, 273 N. W. 812; Ledin v. Holm, 203 Minn. 434, 281 N. W. 762.

The repealing statute was enacted into law on April 10, 1941, during the pendency of the removal proceedings and affected the *right* of removal and not the procedure or *remedy* to be pursued to procure a removal. Had the board fully exercised its right of removal at the time of the repeal of § 2969, the repealing statute could not be given retroactive effect so as to destroy a fully executed right of removal. The act of removal, however, was in embryo until the board, on September 26, 1941, filed its order of removal. Until such time, the legislature had the constitutional right to qualify the board's right of removal, if not entirely to remove it. "Imperfect and inchoate rights are subject to future legislation and may be extinguished while in that condition."

II Lewis' Sutherland, Statutory Construction (2 ed.) § 673; Wistar v. Foster, 46 Minn. 484, 49 N. W. 247, 24 A. S. R. 241.

Accordingly, the board's right of removal must be tested without reference to § 2969, which had been repealed prior to the filing of the removal order. Absent the express power to remove conferred by § 2969, the question then is: Did the state board of education have the power to remove its commissioner of education as an incident to its power to appoint him?

The arbitrary power of removal must not be confused with the power of removal for cause. Offices, even though appointive, are usually created for a definite time, as for a given number of years, for life, or for good behavior. In some cases, however, no such tenure is fixed by law, in which cases the power of removal is inseparably incident to the power of appointment and may be exercised arbitrarily at the will of the appointing power. Oikari v. Independent School Dist. 170 Minn. 301, 212 N. W. 598. The only effect of fixing the tenure by statute is that the appointing power cannot, in such case, remove the official arbitrarily, but only for cause and after due notice and hearing. Mechem, Public Officers, §§ 445, 454; State ex rel. Village of Chisholm v. Bergeron, 156 Minn. 276, 194 N. W. 624.

As the law stood after repeal of § 2969, the legislature had fixed the term of office of the commissioner of education at six years (Minn. St. 1941, § 120.06 [Mason St. 1927, § 2962]), but had neither expressly conferred nor expressly withheld the power to remove. The legislature cannot, however, be held to have deprived the appointing power of its power to remove the commissioner for cause by merely fixing his term of office. Nor can it be asserted that the power of removal was, by the repeal of § 2969, transferred to the civil service board, for that board has no jurisdiction over "administrative heads of departments." Minn. St. 1941, § 43.09, subd. (2), (Mason St. 1940 Supp. § 254-57).

Relator next challenges the right of the board to appoint a referee to receive and file charges and to take testimony thereon.

We have already recited some of the incidents occurring on the opening day of the hearing leading to the appointment of a referee and of special counsel for the board. Following his appointment, the referee, pursuant to the power so conferred upon him, proceeded to conduct all hearings thereafter. However, he made no findings of fact or recommendations but merely transmitted to the board a written transcript and report of the proceedings before him. The board thereupon examined the transcript and report, heard the arguments of counsel, and made exhaustive findings, conclusions, and its order of dismissal, each charge and specification being separately voted upon, one being found to be untrue, the others true.

The referee, pursuant to the authority granted him by the resolution of the board, did grant the board and its attorney leave to file additional specifications and amendments at the beginning and during the progress of the hearing, but, in such instance, offered to give and did give relator as much time as he needed or requested to meet the same. Proper opportunity to meet such additional or amended charges having been given relator, the procedure followed was entirely proper. In re Removal of Nash, 147 Minn. 383, 181 N. W. 570.

While proceedings by an administrative board in the exercise of its power of removal of an appointee are quasi-judicial in nature, yet such board does not, at any stage of removal proceedings, lose its identity as an administrative body and become a court. The regularity of such proceedings must be considered along with the intrinsic nature of administrative bodies, and the fundamental purposes for which they were created must be kept constantly in mind; they must not be tested by the strict legal rules which prevail in courts of law. State ex rel. Hart v. Common Council, 53 Minn. 238, 55 N. W. 118, 39 A. S. R. 595.

Neither the federal nor the state constitution guarantees any particular form of administrative procedure. National L. R. Board v. Mackay R. & T. Co. 304 U. S. 333, 58 S. Ct. 904, 82 L. ed. 1381. All that is required is "adherence to the basic principles that the

legislature shall appropriately determine the standards of administrative action and that in administrative proceedings of quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play." Morgan v. United States, 304 U. S. 1, 14, 58 S. Ct. 773, 775, 999, 82 L. ed. 1129, 1130.

The practice of appointing referees to take and report testimony did not originate with administrative bodies. It is a practice as old as our system of jurisprudence, and has been practiced by courts of equity since time immemorial, and without statutory authority. 53 C. J. p. 680, § 5. So, in Minnesota, the only limitation upon a court's power to appoint a referee is that it cannot be exercised in actions purely at law in which there was an absolute right of trial by jury as the law stood at the time of the adoption of our constitution. Bond v. Welcome, 61 Minn. 43, 63 N. W. 3; Fair v. Stickney Farm Co. 35 Minn. 380, 29 N. W. 49; St. P. & S. C. R. Co. v. Gardner, 19 Minn. 99 (132), 18 Am. R. 334; 53 C. J. p. 682, § 10.

The appointment of a referee is for the convenience of the parties and the court or tribunal; it is often desirable in the interests of expedition and economy, and, as in the case before us, may appear necessary to avoid both delay and interruption and to insure orderly procedure.

Nor is the appointment of a referee in removal proceedings, with the limited power of hearing and reporting testimony, a diversion or delegation of the "power to remove" from the administrative body to the referee. The referee acts in strict subordination to the board itself and is its *alter ego* only in a very limited sense.

As said in Carson v. Smith, 5 Minn. 58, 62 (78), 77 Am. D. 539, concerning referees appointed by trial courts:

"During the trial of the issue before the referee, the cause is as much a cause pending in the original court as if it was on trial in term before a jury; and every act done by the referee is, in contemplation of law, as much an act of the court as if done by the judge in open term time. The court speaks and operates through

the referee, its subordinate officer. The referee exerts no power *proprio vigore*. Without the court he could have no existence; without the court he could not act after his creation; and without confirmation and adoption by the court, his acts have no force or validity whatever. Nothing can originate before a referee, and nothing can terminate with or by the decision of a referee. The court acquires the jurisdiction, and the court renders the judgment upon the controversy, therefore the whole exercise of the judicial power is by the court, the referee acting only in an intermediate capacity as an auxiliary to the court in the ascertainment of certain facts and law necessary to its enlightenment in giving the proper decree or judgment."

So, in the instant case, there was no surrender or delegation by the board of its power to remove—merely a reference to an experienced lawyer, limited, in its scope, to the receipt and filing of detailed specifications and the taking and reporting of evidence. The weighing of evidence and of argument, the making of findings and conclusions, and all essentially judicial functions, the exercise of which resulted in relator's dismissal, were performed solely by the board.

■ It is unnecessary to decide whether, absent consent of the attorney general, the board had the power to appoint a special attorney to appear for it at the removal hearing. The situation here is entirely different from that which arose in State ex rel. Peterson v. District Court, 196 Minn. 44, 264 N. W. 227. There the attorney general insisted that an answer prepared by him be adopted by the state auditor. The latter refused and insisted on presenting his own defense by private counsel, to whose presence the attorney general objected. Here no objections to Mr. Butler's appearance were made by the attorney general and the objections made by relator were withdrawn by his counsel when the referee explained that the assistant attorney general had stated, for the record, that "he and Mr. Butler were appearing together for the state board of education."

Even assuming that the appointment was unauthorized, that fact clearly would not taint the proof submitted or otherwise affect the validity of the removal proceedings. Its sole effect would be to deprive the attorney of his right to compensation from the state. No prejudice could result to relator from the fact that witnesses were examined by and testimony adduced through the services of an unauthorized attorney, for "truth is as impossible to be soiled by any outward touch as the sunbeam." A practical application of Milton's truism is found in the well recognized legal principle that evidence is not rendered incompetent by the fact that it was wrongfully or illegally procured. 20 Am. Jur., Evidence, § 393, p. 352; 2 Dunnell, Dig. & Supp. § 3239.

■ Evidence of specific acts of inefficiency and misconduct occurring during relator's term of office immediately preceding the term current at the time of the hearing was received by the referee, and, based thereon, the board made findings that during said prior term relator was inefficient and guilty of acts inconsistent with the duties of his office. The referee received the evidence for the limited purpose of proving the charge of inefficiency generally. Relator concedes that the evidence was properly received for that limited purpose, but complains that the board erroneously made findings based thereon and that thereby, in part at least, it based its order of removal upon acts occurring during a prior term of office.

"Inefficiency" denotes incapability for office. Therefore, any evidence tending to show such incapability is relevant to the issue of present inefficiency, even though the period to which the evidence relates may have been a prior term in office, or, for that matter, a period during which the official held no public office whatsoever. Hughes v. Dept. of Public Safety, 200 Minn. 16, 273 N. W. 618; State ex rel. Douglas v. Megaarden, 85 Minn. 41, 88 N. W. 412, 89 A. S. R. 534.

The findings and conclusions must be considered as a whole, and, so considered, they satisfactorily show that the board did not make misconduct during relator's first term the basis for his

dismissal. Though finding, as conclusions of law, that relator was guilty of misconduct and inefficiency during his first term, each such conclusion was followed by another of like import expressly limited to the existing term of office.

In his brief and at the oral argument, relator, without having based any assignment of error thereon, argued that the board wrongfully withheld proof at its command by not producing, as witnesses, the heads of various divisions of the department of education. The record does not disclose that these officials refused to testify after request by the relator to appear as witnesses at the hearing.

The board was under no legal or moral duty to present any more evidence than it or its attorney considered necessary to establish grounds for removal. It was the exclusive judge of what evidence it should offer in support of its own charges. True, as relator argues, a presumption might arise against it from its failure to produce evidence (2 Dunnell, Dig. & Supp. § 3444), but such adverse presumption would be the only result of nonproduction of the witnesses.

If, upon learning that these department heads would not appear as witnesses for the board, relator desired their testimony in his own behalf, he had the power to subpoena them under Minn. St. 1941, § 596.01 (Mason St. 1927, § 9809).

Furthermore, if, upon his being so subpoenaed and subjected to examination by relator, the testimony of the witness was adverse and relator could establish that he was surprised thereby, the referee, in the exercise of a sound discretion, could permit the impeachment of the witness by proof of contradictory statements, a proper foundation being laid. 6 Dunnell, Dig. & Supp. § 10351; 28 R. C. L. 601, § 190.

Before proceeding to consider the other 62 assignments of error which attack the sufficiency of the evidence to sustain the findings of the board and the sufficiency of these findings to justify the order of removal, it is necessary that we carefully reconsider the limitations upon our right to review such order of an adminis-

trative body vested with power to remove its appointees for cause.

As said in In re Removal of Nash, 147 Minn. 383, 388, 181 N. W. 570, 572:

"The province of this court in reviewing proceedings brought before it by writ of certiorari is well defined. It may examine the evidence, but only for the purpose of ascertaining whether it' furnished any reasonable or substantial basis for the decision. It cannot reweigh the evidence for the purpose of determining where the preponderance lies, nor substitute its judgment as to the credible-ness of the testimony of a witness for that of the tribunal charged with the duty of determining the facts."

No better summary of the applicable law can be found than in State ex rel. Hart v. Common Council, 53 Minn. 238, 242, 55 N. W. 118, 119, 39 A. S. R. 595, *supra,* where Mr. Justice Mitchell said:

"* * * the evidence may be brought up, not for the purpose of weighing it, to ascertain the preponderance, but merely to ascertain whether there was any evidence at all to sustain the decision of the inferior tribunal,—whether it furnished any legal and substantial basis for the decision. * * * But, while this is so, we recognize the prime importance of each department of government avoiding anything like improper interference with the others in the discharge of their functions; also, that while city councils and other municipal bodies may not have the power to remove from office except for cause, yet, this power being designed to insure efficiency and fidelity in the discharge of official duty, the degree of incompetency or inefficiency which amounts to sufficient cause for removal must of necessity, within certain established limits, rest somewhat in the sound discretion of the officer or body in whom the power of removal is vested."

To authorize removal of any person officially connected with or employed by the state board of education, Mason St. 1927, § 2969, required that he "be found inefficient or guilty of any acts inconsistent with the duties of his office." Neither the state board, the referee, nor counsel was aware of the repeal of this statute by

L. 1941, c. 169, art. XIV, p. 362, and relator was tried upon the theory that, to justify his removal, his derelictions must have amounted to inefficiency or "acts inconsistent with the duties of his office," as the repealed statute provided.

With the statutory definition of "cause" for removal eliminated, we must test the right to remove relator under the accepted definitions of "cause" or "sufficient cause," if there be, in fact, any distinction between these general terms and the specific language used in the repealed statute. We fail to see any material difference, because it is well recognized that even where the statute specifies the ground for removal in the shorter and perhaps broader terms "cause" or "sufficient cause," such cause "must be one which specially relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public" before a removal is justified. State ex rel. Hart v. Common Council, 53 Minn. 238, 244, 55 N. W. 118, 39 A. S. R. 595, *supra.*

Where the removal is to be for official misconduct or for misfeasance or maladministration in office, the misconduct must be such as affects the officer's performance of his duties as an officer and not such as affects only his character as a private individual. In such cases it is necessary "to separate the character of the man from the character of the officer." Mechem, Public Offices and Officers, § 457, p. 290.

Furthermore, under any definition of "cause," a removal order is not justified unless the charge is substantial, as opposed to trivial or inconsequential.

 With these rules before us, let us examine some of the specific charges and findings of misconduct on the part of relator.

*Findings IV, V, XIV, XV, XL, and XLI.* These findings all relate to state aid to schools and constitute the most serious findings of misconduct. We set out in full the more important ones:

"IV. There have been repeated and unnecessary failures by John G. Rockwell, as Commissioner of Education, in each of the years 1937, 1938, 1939, and 1940 to deliver to the State Auditor

the certificates for special state aid to schools at the times required by Section 3034 of Mason's Minnesota Statutes of. 1927. These delays have been for a period of weeks in every case and for a period of months in most cases, and in no case did Dr. Rockwell make a diligent effort, or any but perfunctory effort, to avoid the delay. The delays were avoidable. These delays have forced school districts to borrow many thousands of dollars because of the resultant delay in their receipt of the special state aids, and to pay interest upon that money borrowed.

"V. Regardless of any statutory date set for the certifications of state aids, there have been delays in delivery of certificates for special state aids in the years 1937, 1938, 1939 and 1940 which were unnecessary and were the result of inefficiency by John G. Rockwell in his conduct of his office."

*. * * * *

"XL. Throughout his term of service, John G. Rockwell failed to exercise, and failed to cause or urge his subordinates to exercise, care to insure the accuracy of calculations of state aids.

"XLI. Due to lack of care, numerous overpayments of state aids were made to school districts, thereby depriving the state and the other school districts of large sums of money.

"Included in these overpayments are:

"St. Louis Park, School District No. 1, $26,887.02 in 1938;

"Hopkins, School District No. 19, $16,090.00 in 1938;

"Aitkin, School District No. 1, $6,500.00 in 1939;

"Tracy, School District No. 30, $11,864.39 in 1938."

These findings are abundantly sustained by proof. Relator confesses the delays and errors referred to therein, but seeks to avoid responsibility therefor on the grounds that they were due to (1) acts and omissions of subordinates and (2) lack of adequate help.

So far as responsibility for torts or crimes is concerned, it has frequently been held that a public officer, in the absence of statute, is not answerable for the misfeasances or positive wrongs or the nonfeasances or omissions. of duty of persons properly employed

by him or under him. Throop, Public Officers, § 592, p. 554; City of Duluth v. Ross, 140 Minn. 161, 167 N. W. 485; Robertson v. Sichel, 127 U. S. 507, 8 S. Ct. 1286, 32 L. ed. 203. This rule, even in cases involving civil liability, does not apply where the superior officer, having the power of selection, has failed to use ordinary care therein, or has been negligent in supervising the acts of such subordinates or has directed or authorized the wrong. 46 C. J. 1045, § 330; Mechem, Public Offices and Officers, § 790.

In the case of ministerial, executive, and administrative officers charged with the performance of duties to the public, including the making of reports, the rule of nonliability should, for obvious reasons, not apply. These officers are bound to perform their official duties in a legal and proper manner, exercising due diligence to protect the public's interests and the rights of other departments or divisions of the government. This responsibility cannot be evaded by delegating performance to a deputy or other subordinate, for, whether the officer acts in person or through the medium of another, his legal duties and his responsibilities to the public remain the same. If civil liability to individuals attaches notwithstanding a plea that the act or omission was that of a subordinate (Mechem, Public Offices and Officers, § 797), *a fortiori*, an administrative officer should not be allowed to avoid his positive duty to the public under a similar plea. We therefore hold that the administrative head of a governmental department cannot escape a charge of inefficiency in performing a duty imposed upon his office or upon his department by pleading that the inefficiency, if any, was that of a subordinate. He owes it to the public to see to it that his office is efficiently administered, and if, due to his own inefficiency in selecting employes or subordinates or his own inefficiency in checking their work, the duty imposed upon the administrator or his office is not properly performed, the public, or the department or board to whom he is immediately responsible, can certainly test his efficiency *vel non* in removal proceedings.

The statute relating to special state aids to be paid to public schools expressly provides that "on or before the 1st day of Octo-

ber of each year, it shall be the duty of the commissioner of education to deliver to the state auditor a certificate," etc. Minn. St. 1941, § 128.18 (Mason St. 1927, § 3034). This duty is assigned to the commissioner of education and to no one else, and he cannot avoid responsibility by delegating the statutory duty to inefficient subordinates. It is one of the most important duties assigned to the commissioner. Upon its proper and its prompt performance, school districts throughout the state depend in promptly meeting their obligations and in arranging their finances.

The misfeasance of relator in this regard was by no means innocuous. The record shows that, because of unexplained and unexplainable delays in delivering the necessary certificates to the state auditor, many of the school districts of the state were required to issue interest-bearing warrants in anticipation of the ultimate receipt of state aid. Likewise, the errors in the computation of state aid caused large sums of money to be paid to numerous school districts which they assumed they were legally entitled to and therefore proceeded to spend. This money has not as yet, in most instances, been repaid to the state.

Relator cannot argue that the computations were too complicated to be completed within the statutory time in the face of evidence that there were no similar delays during the administration of the department by his predecessors or his successor in office. Nor does the evidence sustain his claim that there was not sufficient help available, because the record shows that all available help was not used and that the annual budget available for extra help was not fully spent although money was from time to time spent on work not required by law. After all is said, the fact remains that by accepting the office of commissioner, relator undertook to complete the statutory duties assigned to that office. To plead that the work was too much for his administrative abilities, that he could not marshal his time and help so as to effect the required result, is a confession of inefficiency.

Were there no other charges of inefficiency against relator, we should nevertheless be impelled to find that, in the public inter-

est, his delinquencies in connection with state aid certificates were such as to justify, if not to require, his removal.

*Finding VI.* The board found that relator had in numerous instances ordered teachers' certificates to be issued to persons whom he knew lacked the qualifications required by statute and that, contrary to statute, he included school districts employing such unqualified and illegally certified teachers among those districts entitled to state aid. This finding we find amply supported by the record. In respect to the issuance of these teachers' certificates, relator evinced a disregard of explicit statutory provisions. Minn. St. 1941, § 130.02, *et seq.* (Mason St. 1940 Supp. § 2900-1, *et seq.*). His acts tended to disrupt the entire merit system as applied to public teachers, who constitute the bulwark of our educational system. The charges are serious and, being proved, constituted sufficient ground for removal.

*Findings VIII, IX, X, XI, and XVII.* By these findings, which are supported by proof, it is declared that relator failed to coördinate the workings of his department, with the result that numerous contradictory opinions and rulings were published and distributed from time to time respecting important educational questions. These charges, though not as serious as the ones already referred to, nevertheless point toward inefficiency, and it was for the board to determine whether, considered alone or in connection with other charges, they constituted ground for removal.

*Findings XVIII, XIX, XX, XXI, XXII, and XXIII.* These findings relate to numerous instances in which relator undertook surveys and projects of various types only to abandon them before completion. Had there been but one such instance, it would have been inconsequential, but the fact that many projects were abandoned after substantial expenditures of time and money was evidence of inefficiency.

*Findings XXXII, XXXIV, XXXV, and XXXVI.* The board found that relator withheld information on matters as to which he knew the board should be informed and failed to make recommendations to it which would have facilitated its work. As a

specific instance, it was found that one Eugene D. Carstater, director of vocational education, had written relator that he was willing to waive the civil service law, which fact was withheld. Mr. Carstater was suspected of un-American activities and was in disfavor with the board. He was not considered a proper head of the important department of vocational education. Had relator advised the board of the receipt of this letter, an amicable adjustment of the controversy between the board and Carstater might have been found; but relator withheld this fact from the board and, instead of facilitating a solution of the controversy, forced the board to file formal charges with the civil service board asking for Carstater's removal. The fact that the civil service board and, upon appeal, the district court of Ramsey county, exonerated Carstater from the charges made against him does not militate against the charge of "withholding information" of which relator was found guilty. The primary duty was to the board and not to Carstater.

Another instance was the withholding of information in respect to one Grace H. Carlson, an employe who was suspected of being a communist, an advocate of overthrow of the government by violence, and unwilling to support the constitution of the United States. It was shown that Mrs. Carlson was active in this connection, that relator knew of her activities, yet made no report thereof to the board. Considering the vital necessity of keeping our school system free from any taint of communism, it was relator's duty to report immediately any well-founded report of Mrs. Carlson's un-American activities without waiting for positive proof. This he failed to do; instead he tried to retain her as an employe and attempted to dissuade her from resigning.

There having been evidence to support the findings above referred to, we need not determine the weight of that evidence, for that was a question for the board and not this court. Nor is it necessary for us to discuss in detail the other findings of the board. Suffice it to say that, with the exceptions hereinafter noted, the charges upon which the findings are based are substantial, relate

to official duties, and are supported by sufficient evidence within the rules already given.

There are several charges and findings based thereon which we find not to be substantial or without any support in the evidence.

*Finding VII.* Relator was found guilty of delaying the distribution of national defense record cards, which, if used by the schools, would have promoted efficient placing of students in the armed forces of the United States. The record cards were first proposed to Eugene D. Carstater, then state director of vocational education, by a federal official, in March 1940. Correspondence was exchanged and a report made to the state board at its next meeting on April 1, resulting in no action on its part. Again, on May 13, the board failed to take action but laid the matter over to its next meeting on June 3, at which time the school year was nearly ended. At that meeting it was decided to make the use of the records available to the schools, but without recommendation. This met with approval of authorities at Washington, and distribution was thereupon made. Granted that relator concurred with Carstater, who objected to the distribution of the record cards on the unsound ground that such records would enable the federal government to regiment workers, the fact remains that the matter was twice submitted to the board without action, and the delay is as much attributable to its members as to relator.

*Finding XIII.* A compilation of school laws was published and distributed in 1939 under the immediate direction of A. B. Caldwell, the deputy commissioner of education, who, though not an attorney at law, had some legal training, as well as extensive experience in the field of school administration. The compilation was an excellent assembling of all Minnesota laws relating to education and contained complete annotations and a copious index. Only one error was discovered from cover to cover of the work, and this in one of the annotations. The project had been begun by the attorney general but abandoned. Relator and his deputy deserve praise rather than censure for this undertaking, which un-

questionably was most valuable to county superintendents and local school officers throughout the state.

With these exceptions, the state board's findings of specific acts of misconduct and inefficiency have substantial support in the record. The charges and findings in general terms have been disregarded. Nor have we attached any importance to the purported admissions of inefficiency by relator during cross-examination by adroit counsel and the findings based thereon. These admissions must be considered as part of the entire cross-examination, throughout which relator maintained that the department of education had been efficiently conducted during his entire administration thereof. The admissions merely tend to show commendable modesty on the part of relator.

Writ discharged and the decision of the state board of education affirmed.

