## JOHN G. BERTHIAUME v. VICTOR CHRISTGAU.[1]

June 30, 1944.

No. 33,788.

*William D. Gunn,* for relator.

*J. A. A. Burnquist,* Attorney General, and *K. D. Stalland,* Assistant Attorney General, for respondent.

THOMAS GALLAGHER, JUSTICE.

*Certiorari* to review a decision of the state director of the division of employment and security holding relator ineligible for unemployment compensation.

Relator was first disqualified by a claims deputy of the division on October 15, 1943, for failure to apply for available suitable work as required by Minn. St. 1941, § 268.09(4), (Mason St. 1940 Supp. § 4337-27D), as amended by L. 1943, c. 650, § 5(E). Subsequently, on November 9, 1943, an appeal tribunal of the division set aside

[1]Reported in 15 N. W. (2d) 115.

the deputy's decision holding relator disqualified because of failure to apply·for available suitable work, but held him ineligible to receive benefits under the act on the ground that he had not held himself available for work as provided for by § 268.08(3), (§ 4337-26[C]), as amended by L. 1943, c. 650, § 4(C). On December 31, 1943, the latter determination was affirmed by the director. It is this decision which relator seeks to review.

The question presented for determination is whether relator was properly held ineligible for benefits under the act because he was not available for work within the meaning of L. 1943, c. 650, § 4(C).

The facts are as follows: Relator by occupation is a boilermaker's helper or journeyman boilermaker. Subsequent to July 5, 1943, he was employed at intervals by the Babcock-Wilcox Company in St. Paul. His wage at about the time in question was $1.70 per hour with time and a half for time over eight hours per day or 40 hours per week.

On October 5, 1943, relator's employment was terminated because of lack of working materials. He was then assured that as soon as material was available he would be reëmployed. On October 11, 1943, he registered for employment and filed a claim for benefits with the division of employment and security. He thereafter reported his continued unemployment as required by the act. On October 11, 1943, a representative of the U. S. Employment Service requested him to apply for work at the Northwest Terminal Company in Minneapolis as a truck driver, at an hourly wage of 85 cents with time and a half for all hours over 40 per week. Because of his belief that he was shortly to resume work at his regular trade as a journeyman boilermaker, relator refused to accept such employment. Subsequently, on October 18, 1943, he resumed work for the Babcock-Wilcox Company at his usual trade, and there is involved here only his right to benefits for the period between October 5 and October 18, 1943.

It is undisputed that the business agent of relator's union handled all employment and reëmployment of its members, including that of relator, and that prospective employers contacted him when

they desired journeymen boilermakers. It is further undisputed that he had assured relator at the time the claim for benefits was filed that he would shortly be called back to work at his regular trade as a journeyman boilermaker. Relator admits that during his unemployment he was waiting for employment to turn up in his regular trade or occupation. It is further undisputed that the union had no difficulty in placing its men, and that the union's business agent had been advised by the Babcock-Wilcox Company that it would shortly thereafter again require relator's services. It is further undisputed that relator's usual work is highly specialized. He is designated as a "high man" and to a great extent must work on beams high in the air, for which special training is required. Because of these facts, it was the customary practice of the union to hold available for this work men trained along this line. For this reason, relator was asked by his union to wait for employment in his own trade. Such work became available on October 18, 1943, about 13 days after the original termination of his employment. The work was directly connected with the national defense effort.

An examination of the record discloses that there is involved in these proceedings an interpretation of two sections of the act, to wit: L. 1943, c. 650, §§ 4 and 5. Insofar as they may be applicable here, these sections provide:

"Sec. 4. An individual shall be eligible to receive benefits with respect to any week of unemployment only if the director finds that:

\* \* \* \* \*

"C. He was able to work and was available for work in his usual trade or occupation or in any other trade or occupation for which he demonstrates he is reasonably fitted and is actually seeking work;

"Sec. 5. An individual shall be disqualified for benefits:

\* \* \* \* \*

"E. If the director finds that he has failed, without good cause, either to apply for available, suitable work when so directed by the employment office or the director or to accept suitable work when

offered him, or to return to his customary self-employment (if any) when so directed by the director. * * * Suitable work shall be his former employment or any work for which such individual is reasonably fitted and for which work the wages are equal to 125% of the weekly benefit amount for total unemployment.

"(1) In determining whether or not any work is suitable for an individual, the director shall consider the degree of risk involved to his health, safety, and morals, his physical fitness and prior training, his experience, his length of unemployment *and prospects of securing local work in his customary occupation,* and the distance of the available work from his residence." (Italics supplied.)

The claims deputy, in substance, held relator ineligible for benefits under these sections, saying:

"* * * The claimant is held to have failed without good cause to apply for available suitable work for the reason that (1) the claimant has no prospects of work in his regular occupation (2) the job to which he was referred would have paid him the prevailing wage scale and (3) manpower policies permit one to leave one job to accept another at which greater utilization of his skills can be had."

Apparently, because the evidence appeared conclusive that relator had immediate prospects of work in his regular trade, this theory was abandoned by the director on appeal, and a specific finding was made that relator was ineligible under § 4(C) because he was not seeking work except in his own trade, and hence was not available for the other work provided for in said section.

Originally this latter section merely provided that, to be eligible for benefits, a worker must demonstrate that he was able to work and was available for work. § 268.08(3), (§ 4337-26[C]), *supra.* This section was amended by § 4(C) of the 1943 act, which added the words "in his usual trade or occupation or in any other trade or occupation for which he demonstrates he is reasonably fitted and is actually seeking work."

Relator contends that the word "or" as used in the amended section implies a choice between the two alternatives expressed therein, and means one *or* the other thereof, but not both, and that, since he was available for the first alternative specified, namely, "his usual trade or occupation," he was entitled to benefits under the act. Respondent asserts that "or" has a different meaning and should be construed as a conjunctive to mean "and" and that, in order to be eligible for benefits under the act, a claimant must demonstrate that he was available at all times, both for work at his usual trade *and* in any other trade for which he is reasonably fitted.

Relator points out that if his theory of the meaning of this section is not followed a situation may develop where (1) a claimant by waiting for expected resumption of his regular employment would lose all benefits under the act; or (2) by accepting the substitute employment and continuing therein, lose opportunities for resuming work in his usual trade; or (3) by taking the substitute employment and terminating the same as soon as work in his usual trade becomes available, become subject to the penalties set forth in L. 1943, c. 650, § 5(A), which provides that an employe who leaves his employment without good cause attributable to his employer is subject to certain disqualifications if he subsequently becomes unemployed.

Respondent, on the other hand, asserts that if the construction urged by relator is given this section a claimant might delay indefinitely his resumption of any suitable employment, under the claim or pretext that he was available only for work in his usual trade (even though there were no prospects thereof), and nevertheless be eligible for benefits under the act.

A close scrutiny of the two sections indicates that they must be considered together to arrive at a logical and sensible result. It is apparent the legislature intended that an individual should not be disqualified for benefits because of his refusal to accept employment in a trade other than his own when there are reasonable prospects of his securing local work in his customary occupation.

As indicated, § 5(E)(1) of the 1943 act provides that, in determining whether any available work is *suitable,* the director shall first consider the prospects of the applicant's obtaining local work in his customary occupation. Presumably, if there are such prospects, then substitute work offered is not deemed suitable within the meaning of that section.

In the light of such limitation, § 4(C), must be construed to mean that, to be eligible for unemployment benefits, an applicant must be available for work in his usual trade (which of course would be suitable) and, if there are no prospects of employment therein within a reasonable time, also for work in other occupations for which he is reasonably fitted and which is otherwise suitable under § 5(E)(1) of the act. In other words, if an applicant presents sufficient evidence to establish as a fact that there are prospects of returning to work in his own trade within a reasonable time, then work in some other trade for which he should otherwise be available and which would otherwise be deemed suitable becomes unsuitable under the definition thereof above referred to.

On the other hand, should it be determined as a question of fact that a claimant has no prospect of returning to his usual trade within a reasonable time, then work in some other trade for which he is reasonably fitted and which meets the other requirements specified in § 5(E)(1) may become suitable, and the burden falls upon him to establish that he has held himself available therefor, as well as for work in his own trade, under § 4(C). This construction gives effect to the legislative intention and at the same time overcomes the objections and difficulties pointed out by relator and respondent, as above set forth. See, Aslakson v. State Dept. of Highways, 217 Minn. 524, 15 N. W. (2d) 22.

Applying this doctrine to the instant case, since the evidence here is undisputed that there was a good prospect of relator's resuming work in his regular trade within a short time, a fact corroborated by his actual return thereto within two weeks, it follows that work in some other trade or occupation became un-

suitable under the definition of "suitable work" in § 5(E) of the act, and the fact that relator was not available for such unsuitable work did not render him ineligible for unemployment benefits under the act.

Reversed.

STREISSGUTH, JUSTICE (dissenting).

Unemployment compensation came to this state in 1936 as part of a nationwide social experiment designed to combat the evils of involuntary unemployment. The legislative aim was to forestall "serious menace to the health, morals, and welfare of the people," through a plan insuring that those who by their toil contribute to the prosperity of industry shall be "provide[d] benefits for periods of unemployment." The plan has more than justified the tax it imposes exclusively upon industry. What was formerly an experiment is now an accepted supplement of our system of free enterprise. Industry, no less than labor, is now its champion. And, labor, no less than industry, should join with the courts in procuring the application of the plan, as designed, for the "public good and the general welfare of the citizens of this state." (Quoted clauses are from preamble of Minnesota employment and security act, Minn. St. 1941, § 268.03 [Mason St. 1940 Supp. § 4337-21]).

"* * * it has become 'a dominant rule' of statutory construction 'to discover and give effect to the legislative purpose * * *.'" North Shore F. & F. Co. v. North Shore B. M. T. Assn. 195 Minn. 336, 341, 263 N. W. 98, 100. A statute must be construed in the light of the evils sought to be remedied. Its reason and object are the best clues to its real meaning. 6 Dunnell, Dig. & Supp. § 8962; Mills v. South Carolina Unemp. Comp. Comm. 204 S. C. 37, 28 S. E. (2d) 535. "Above all things," explains Dean Pound, "regard must be had to the exigencies of social life, to the social ends to be served, to the effect of the different possible interpretations or applications upon the community to be governed thereby." "Courts and Legislation," 9 Modern Legal Philosophy Series, 202, 224, 7 American Political Science Review, 361, 379. So, Mr. Justice Cardozo has

approved this statement by Brütt, an eminent German authority: "The interpreter must above all things put aside his estimate of political and legislative values, and must endeavor to ascertain in a purely objective spirit what ordering of the social life of the community comports best with the aim of the law in question in the circumstances before him." Cardozo, The Nature of the Judicial Process, p. 90.

In examining the Minnesota employment and security act, we are left in no doubt as to the "social ends to be served" by it. The legislative purpose and aim are clearly expressed in unequivocal language by the legislature itself in the preamble to the act, which reads as follows (§ 268.03 [§ 4337-21], *supra*):

"* * * Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burdens. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state will be promoted by providing, under the police powers of the state for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

The legislature could not have used plainer language to disclose its purpose of creating a rainy-day fund for those who, *"through no fault of their own"* but through the fault of the highly industrialized society in which they live, are subject to *"involuntary unemployment"* with "serious social consequences." The language of the preamble shows that the legislature recognized that its power to create an unemployment fund could only be invoked where "the

public good and the general welfare of the citizens of this state" was "promoted," and that it could not embark on an unrestricted plan of unemployment insurance. The only valid basis for social legislation of this type is "the police powers of the state," which the legislature emphasized it was invoking.

By virtue of this legislation, persons willing to work but unable to find employment for which they are suited may honorably apply for unemployment benefits without embarrassment and without "the serious social consequences of poor relief assistance." The legislation cannot be justified as a means of providing ordinary insurance benefits to temporarily unemployed workmen who are unwilling to assume suitable work other than that in which they have most recently been engaged, on the pretext or prospect of regaining their former employment which paid more attractive wages. If such workers wish to wait for their former jobs, that is their privilege; but it is not "a subject of general interest and concern" that they be financed during the waiting period at the expense of industry. The unemployment compensation fund is a public trust fund for the exclusive benefit of such worthy unemployed workers for whom no living income from suitable work of any type is forthcoming from industry, upon which the burden of creating and maintaining the fund is cast.

The role of the state in administering the law through its director of employment and security is that of a trustee. The terms of the trust are embodied in the statute; the beneficiaries of the trust are "the people of this state," and not merely the individual employes to whom cash benefits are paid. The unemployment compensation fund, no less than any other trust fund, must be preserved for the humanitarian purposes for which it was created—society's insurance against "involuntary unemployment" of its members. Employes as well as their union representatives should at all times be willing to coöperate with the director to avoid diversion of the fund for other purposes, lest by uncontemplated and unauthorized payments from the fund, it be depleted and the benevolent purposes of the act defeated.

The state, by accepting the trusteeship, has obligated itself to distribute benefits to each insured worker during periods of his "involuntary unemployment," provided he complies with the statutory conditions or rules of eligibility. One of these conditions, contained in the 1943 amendment, is that the director—representing the state—"finds" that "He [the unemployed worker] was able to work and was available for work in his usual trade or occupation *or in any other trade or occupation for which he demonstrates he is reasonably fitted* and is actually seeking work." L. 1943, c. 650, § 4(C). (Italics supplied.) I can reach no other conclusion than that it is not for the applicant for benefits, but for the director, to "find," *i. e.,* to determine and decide, in the exercise of a fair and reasonable discretion, whether an able applicant should be allowed to remain idle—at the expense of the unemployment fund—on the prospect of procuring work in his usual trade or occupation, or whether he should be assigned to work in another trade or occupation for which he has demonstrated reasonable fitness. At least that is what the statute in effect says, and I cannot shut my eyes to what appear to be the clear terms of the statutory trust.

Suppose Frank Sinatra, or some other popular radio crooner, were the beneficiary of a trust, in substantially the statutory language, which allowed him weekly benefits of $10,000 (more or less) upon condition that he would be (§ 4) "eligible to receive benefits with respect to any week" only if he "was available for work in his usual trade or occupation [radio] *or* in any other trade or occupation for which he demonstrates he is reasonably fitted." Suppose, further, that no radio sponsor could be found, but that the trustee requested him to make personal appearances in theatres or army camps, for which he was also "fitted." Could he refuse that work and still claim his weekly stipend by arguing, as relator does here, that the choice between the two forms of work lay with him and that the use of the word "or," a disjunctive, instead of the conjunctive "and," made him eligible to benefits so long as he was "available" for radio work, and that, in spite of the fact that he was not "available" for theatre appearances? Clearly not. No

radio work being available, the determination of whether he should be assigned to other work would lie with the trustee and not with him.

The employment and security act was never intended to put a premium upon idleness or fastidiousness, but to furnish security in times of adversity to those willing, but unable, to find honorable and suitable employment of any type. The legislature, in stating that the purpose of "the systematic accumulation of funds during periods of employment" is to "provide benefits for periods of unemployment," had in mind periods of general unemployment when there are not enough jobs to accommodate the honest unemployed, willing to assume, but unable to find, suitable work. It expected full coöperation from every applicant for benefits. It did not expect an applicant to be so choosy as to turn down honorable employment when it was available, because it did not pay him so well or suit him so well as his former job. The construction placed upon the law by the majority ignores the plain intent of the entire unemployment setup and puts a premium on idleness never contemplated by the legislature. To adopt the majority's construction will mean higher rates, or ultimate insolvency of the unemployment fund—a consummation which can be avoided without material sacrifice to the worthy unemployed if we exact reasonableness and fair play on the part of the director and coöperation on the part of the unemployed.

To turn, then, to the brief facts of this case: Relator, 31 years of age, had followed the boilermaker trade for only 13 months prior to being laid off in October 1943. He was then classified as a "boilermaker's helper," the lowest classification in the trade, but was earning $1.45 to $1.70 per hour with time and a half for overtime. To attain the higher status of "journeyman" would ordinarily require four years of experience. Prior to becoming a boilermaker's helper, relator was a common laborer, with some experience as a truck driver; in fact he had been employed as a truck driver by a commercial trucking company during previous periods of unemployment as a boilermaker's helper. Upon making application

for unemployment benefits, he was offered work as a truck driver at 85 cents an hour, with time and a half for overtime, but turned it down because he had reasonable assurance that he would shortly be called back to work as a boilermaker's helper. He decided to ask for unemployment benefits and wait for reëmployment in his newly chosen field of boilermaking, which paid him twice as much as the proffered job. In my opinion, by so voluntarily rejecting the trucking job, for which he was also fitted, he rendered himself ineligible to unemployment benefits. His was not a case of "involuntary unemployment" as that term is used in the act under discussion.

Decisions from other states construing statutes similar, though not identical to ours, emphasize that the term "involuntary unemployment," as used by the legislature, has reference to "unemployment resulting from a failure of industry to provide stable employment." Mills v. South Carolina Unemp. Comp. Comm. 204 S. C. 37, 28 S. E. (2d) 535, 536. "* * * where the employee is not able to obtain work in his usual trade of[or] occupation, then he or she must be available for some other employment for which she is reasonably fitted" to be entitled to benefits. Brown-Brockmeyer Co. v. Board of Review, 70 Ohio App. 370, 376, 45 N. E. (2d) 152, 155. So, in W. T. Grant Co. v. Board of Review, 129 N. J. L. 402, 29 A. (2d) 858, 861, the court asked: "Does work, otherwise suitable, become statutorily unsuitable for the single reason that the worker desires and hopes to get, but has not yet obtained, a position elsewhere with larger pay?" and answered its own question, "We think not."

The conclusion I reach also seems inescapable when the background of the 1943 amendment is considered. In 1942, there was pending before the division of employment and security the claim of Orle Bowman, later brought before this court (Bowman v. Troy Launderers & Cleaners, Inc. 215 Minn. 226, 9 N. W. [2d] 506). Bowman was laid off as a steam cleaner, his usual work; instead, his employer offered him light garage work, stock work, and some truck driving, drawing less pay. This Bowman refused, notwith-

standing that during the off season in former years he had worked in other departments at different rates of pay, each time to be reassigned to cleaning when business in that department picked up sufficiently. These facts were held to justify the director in holding that, under the law as it then stood, the employe had good cause not to accept the offer of work in another department.

While the Bowman case was pending in this court, the 1943 legislature amended the eligibility provisions of the law in the manner indicated in the opinion of the majority here. At the same time it amended the disqualification provisions so that "suitable work," as now defined, shall be an individual's "former employment *or any work for which such individual is reasonably fitted* and for which work the wages are equal to 125% of the weekly benefit amount for total unemployment." (Italics supplied.) L. 1943, c. 650, § 5(E). These amendments are, in effect, mandates from the legislature to the director of employment and security not to again apply the law as it did in the Bowman case. The circumstances surrounding the adoption of the amendments definitely indicate that the legislature intended that an applicant for benefits must accept work in any trade or occupation for which he is fitted which pays at least 125 percent of the weekly benefits, or be ineligible for benefits.

I, therefore, respectfully dissent.