RALPH E. HAMLIN AND OTHERS v. THE COOLERATOR COMPANY.
VICTOR CHRISTGAU, RESPONDENT.[1]

January 14, 1949.

No. 34,728.

*John H. Louisell, David W. Louisell,* and *Spencer & Louisell,* for relators.

*McCabe, Gruber, Clure, Donovan & Crassweller,* for respondent employer.

*J. A. A. Burnquist,* Attorney General, and *K. D. Stalland,* Assistant Attorney General, for respondent Victor Christgau as director of the Division of Employment and Security.

[1]Reported in 35 N. W. (2d) 616.

FRANK T. GALLAGHER, JUSTICE.

Certiorari to review a decision of the director of the Minnesota division of employment and security.

Relators were all employes of respondent Coolerator Company at the time of the hearing before the appeal tribunal of the division on September 23, 1947, and had been so employed during all the times material herein. They filed claims for benefits under the Minnesota employment and security law for the week from July 28 to August 3, 1947. Employer is a corporation operating a refrigerator manufacturing business in Duluth, Minnesota, and is subject to the Minnesota employment and security law (M. S. A. 268.03 to 268.24). Its employes, including relators, are members of Local Union No. 1096 of the United Steelworkers of America, which union has represented the production employes of the employer for collective bargaining purposes since 1936 under contracts entered into, renewed, or supplemented each year.

On October 1, 1941, employer entered into a collective bargaining agreement with the union. The pertinent part of that contract respecting vacation or bonus pay is incorporated in Article IV(C), which reads:

"When an employee desires to forgo his vacation, said vacation shall be taken in the form of a bonus, figured on the basis above set forth."

After the execution of the 1941 contract, several supplemental contracts were entered into between the parties, none of which affected Article IV(C). On January 16, 1946, another contract was entered into between the employer and the union, supplemented thereafter by further agreements from time to time, none of which supplemental agreements pertained to Article IV(C). In the 1946 contract Article IV(C) was omitted. Relators claim that this omission was inadvertent and unintentional, and they show that, notwithstanding this omission, employer continued to abide by the provisions of the bonus clause in 1946 the same as in previous years since 1941, when the clause was included in the contract. With reference to

this, the record shows that on June 13, 1946, the union representative made a written request to employer that "vacation money be paid in the form of a bonus as has been the practice in the previous seasons under former contracts," and that on the same date employer responded that "the Company agrees to forgoing the vacation week this year [1946] and will pay the vacation pay as a bonus * * *."

The question came up again in 1947 as to whether the same procedure would be followed in that year as in previous years since 1941 with reference to the payment of the vacation pay as a bonus. At a meeting of union and employer representatives, held March 27, 1947, there was some discussion with reference to a shutdown of the plant during the summer of that year. We quote from the testimony of Richard W. Reinhart, industrial relations representative for employer:

"Q. Well, what was the outcome of that meeting?

"A. The outcome on that was: The year before we had signed a waiver; we had amended the contract to take care of a situation of this kind. This year, the company did not want to enter into any agreement to waive it; on the other hand, they didn't object to it—the company didn't want to object to it on the basis of employees not receiving this unemployment insurance, but they didn't want to enter into any agreement between the union and the company that would call this anything else but a vacation period; however, after the holiday period, we did enter—we did sign an agreement that we would call it a shutdown period, as in the past.

\* \* \* \* \*

"Mr. Reinhart: On this meeting we had with the union on March 27, the company and the union were not in agreement—that it should be called a holiday.

"Mr. Debel:

"Q. That it should be called a what?

"A. That it should be called a holiday; that was the company maintained they were going to shut down the plant for this one week, and the union wanted us to designate that a lay-off period, instead of a holiday.

"Q. Instead of a vacation lay-off?

"A. That's right; instead of a vacation lay-off. And between March 27 and vacation period, or this lay-off period, we were not in agreement on that.

"Q. What did the union want to call it?

"A. They wanted to call it a lay-off because there were certain employees that didn't feel they needed a vacation, and they wanted to take their vacation pay the same as they had during past years.

\* \* \* \* \*

"Q. Now, you come to 1947. You had a meeting March 27, 1947, is that right?

"A. That's right.

"Q. And the company wanted to then call it a vacation, is that right?

"A. That's right.

"Q. And the union wanted to still proceed on the old provision, that it was a bonus—

"A. Right.

"Q. —relating to past services, is that right?

"A. Yes."

According to the affidavit of Glenn E. Pearson and John Cashin, president and business agent respectively of the union, which affidavit is contained in the record, they and members of the grievance committee of the union conferred with employer in June 1947 and at that time advised the latter that they elected, on behalf of the productive employes, including relators, to forego their vacation period during the year 1947 and take in lieu thereof a bonus, and that at no time did they waive this provision.

On July 3, 1947, each relator received a check from employer. These checks, which were in various amounts, were in addition to the regular pay checks of relators, and in no instance the exact amount of one week's pay. Each of the relators testified that he understood that the check he received on that date was in payment of a bonus (similar to bonus payments received in previous years). Relator Farquharson testified that it said "Vacation pay" on his

check stub. Attached to the affidavit of Pearson and Cashin and made a part thereof are copies of the bonus or so-called vacation check stubs of John Cashin received from employer in 1944, 1945, and 1946, during which years, according to the affidavit, all employes of employer received "Bonus checks" in lieu of vacation pay. The affidavit further stated that identically the same type of check and stub was received during the year 1947. Stub No. 29366, shown in the record, contains this notation: "V. P. 1944"; stubs Nos. 43572 and 53885 contain these printed notations respectively: "Vacation Payroll 1945" and "Vacation Payroll 1946."

Mr. Reinhart testified that notices were posted in the plant stating that it would be closed for vacation purposes during the week of July 25 to August 3 (1947). No copy of this notice was produced at the hearing. Reinhart testified in part:

"Q. What did it say, the substance, do you know?

"A. The plant would be shut down between July 25, to October 3, for vacations.

"Q. You mean August 3, don't you?

"A. For vacations. The word vacation was on the telegram.

"Mr. McCabe: What?

"A. The word vacation was designated on this telegram; that was on it; said it was a vacation.

"Mr. Jacobson:

"Q. Did the word vacation appear on that notice?

"A. That's right."

Relators contend that they had a contractual right to elect to forego vacations and receive in lieu thereof vacation bonuses and that such right is based on the contract between the union and the employer. They claim that they exercised this right for the year 1947 and elected to receive bonuses in lieu of vacations; that pursuant to such election they actually received from employer on July 3, 1947, bonus checks in lieu of vacations. They therefore contend that the period from July 28 to August 3, 1947, was wholly unrelated to vacations and was for them a period of genuine unem-

ployment, for which they are entitled to compensation benefits. They claim that at the commencement of the shutdown on July 28 (1947) it was not definitely known when the plant would reopen. Relator Hamlin, when asked if the foreman told him when the plant would reopen, testified in part:

"A. He told us it would be opened in a week, as far as he knew.

"Q. Were you told when to come back to work?

"A. We were told to report in one week, unless further notice was given."

Relator Farquharson testified in part:

"Q. But somebody told you to return to work August 4, is that right?

"A. Well, there was a notice posted on the board two days, I imagine—I think it was two days before the, before the vacation—

"Mr. Debel:

"Q. Shutdown—

"A. Shutdown—

"Q. —or vacation?

"A. —stating that we were to come back to work, report back, August 4, or else until further knowledge—or further notice. Otherwise—"

Relator Jobin testified:

"Q. The question was, did the foreman tell you when to return to work—

"A. Yes.

"Q. —and when did he tell you to return to work?

"A. If I'm not mistaking, it was on that Monday you speak of. I think it was August 4, unless further notice—

"Q. Well, for your information, the second Monday following July 25 is August 4."

To offset this testimony, employer claims that the employes were advised to return to work on August 4.

Relators also contend that the shutdown of the plant was caused by a shortage of materials. One relator said that it was his interpretation that it was lack of material. Another said that to his knowledge it was a shortage of material. A stockman testified that "they didn't have any material." The affidavit of Pearson and Cashin stated that the layoffs resulted from material shortages. This testimony is disputed by Rex H. Sanford, treasurer and assistant secretary of employer, who said that the reason for the shutdown was the vacation. When asked if employer had materials and supplies available at this time in order to keep the plant operating, he replied: "I would say, yes, to a limited degree, because we never have enough materials." Mr. Reinhart testified for employer that they stopped shipments for the week commencing July 25 because the plant was going on vacation, but that they had plenty of material on hand at the time the vacation was put into effect.

It appears that some seven weeks after the checks of July 3 were paid to the workers and about three weeks after the plant had been reopened on August 4 some attempt was made by the employer and union representatives to correct or amend the contract of January 16, 1946. Employer wrote the union on August 20, 1947, in part as follows, according to employer's exhibit G in the record:

"Pursuant to past practice and based on the terms of our former contracts, we are willing to amend our Vacation Clause as follows:

" 'When an employee desires to forgo his vacation, said vacation shall be taken in the form of a bonus, figured on a basis as set forth in Article IX of the contract between the parties now in effect.

" 'However, in the future if the company elects to close the plant for vacation purposes, the vacation shall be taken by the employees at that time.' "

There is also some testimony by the attorney for the employer that Article IV(C) was left out of the 1946 contract "by some error in printing the new contract." Further explaining the letter of August 20, 1947, employer's attorney testified in part:

"Mr. McCabe: All right; now, at this time, this question had

come up as to whether the union were entitled to unemployment compensation for this particular week, and because of that, and management did not wish to change its position when such a claim was made, we informed the union on behalf of the management that we would not change our past policy—not past policy—we wouldn't change from the stand we had taken, that this must be designated as a vacation; but when they pointed out there had been an omission from the contract, and Mr. Reinhart said he fully substantiated them on that respect, we agreed to write this letter to amend the contract.

"Mr. Jacobson: You mean to amend or to put into writing the oral agreement that should have been in there, is that right?

"A. That's right; to incorporate what we agreed had been left out.

"Mr. Debel:

"Q. And that's now in the form of your letter—

"A. Of August 20.

"Q. '47?

"A. That's right.

"Q. Now, then, was the idea of that that it should have retroactive effect?

"A. Yes; yes.

"Mr. Jacobson:

\* \* \* \* \*

"Q. Well, what was the company's intent?

"A. Our intent was to incorporate a provision that the union claimed had been left out of the contract, and which we agreed had been left out."

The director contends in his brief that the only contract involved in this case and the only contract in force at the time the issue in this case arose, to wit, in the summer of 1947, was the contract entered into between the union and the employer on January 16, 1946. He contends that the contract of October 1, 1941, and certain supplementary agreements made thereto between that date and January 16, 1946, are not involved herein. He argues that the 1946 contract

was complete in itself and that it does not allude to any previous contracts or supplements to previous contracts by reference. He further argues in his brief:

"* * * The fact the employer and the employees' union made an abortive attempt *to amend the 1946 contract* retroactively so as to bind the state and circumvent the law, Minnesota Statutes 1945, as amended, 268.08, subd. 3, is ample evidence of the fact that prior to the time of writing their brief in this case, relators and employer-respondent recognized that the contract of January 16, 1946, was the only contract involved in this matter."

The director further contends that there was no inadvertent omission from the contract of January 16, 1946, of the provision contained in Article IV (C) of the 1941 contract. He argues as proof of this that when the union representative wrote employer on June 13, 1946, requesting that vacation money be paid that year in the form of a bonus he knew full well that the 1946 contract did not so provide. He contends that there is no suggestion in the exchange of correspondence between employer and the union at that time of any intention to include the provision previously contained in the 1941 contract in the 1946 contract. If there had been, he argues, there would have been ample time to make the change, and if there had been any such intention to make the change employer would not have limited the concession on that point to the year 1946 only. He also argues that on November 29, 1946, the union and the employer entered into a supplementary agreement which modified the 1946 contract with reference to the rate of pay to workers, and that there was no change made in the contract with reference to vacation pay at that time. He continues that again on May 15, 1947, another supplementary agreement was entered into modifying the contract of January 16, 1946, and that it is obvious from that supplementary agreement that all the rights and benefits, including vacations and paid holidays, were considered at that time, but that no mention was made of changing the vacation provisions in the 1946 contract.

M. S. A. 268.04, subd. 23, provides in part:

"An individual shall be deemed 'unemployed' in any week during which he performs no service and with respect to which no wages are payable to him, or in any week of less than full time work if the wages payable to him with respect to such week are less than his weekly benefit amount."

Section 268.08, subd. 1(4), provides:

"He has been unemployed for a waiting period of two weeks during which he is otherwise eligible for benefits under sections 268.03 to 268.24. No individual shall be required to serve a waiting period of more than two weeks within the one year period subsequent to filing a valid claim and commencing with the week within which such valid claim was filed. Such weeks of unemployment need not be consecutive."

Section 268.08, subd. 3, provides in part:

"An individual shall not be eligible to receive benefits for any week with respect to which he is receiving, has received, or has filed a claim for remuneration in an amount equal to or in excess of his weekly benefit amount in the form of

"(1) * * *

"(2) vacation allowance; * * *"

The appeal tribunal found in part that employer had a contract with the union under the terms of which the former agreed to pay the workers a vacation allowance each year; that the amount of such allowance was based in part upon seniority and in part upon the number of hours worked and of pay rates of the worker during the year preceding the year in which the allowance was to be made; that the period for the computation of the allowances was from June 1 to June 1, subject to an additional one month's time in which employer was allowed to complete clerical work necessary to prepare checks; that vacation allowance checks, computed as required by the contract, were delivered to the employes, including relators, early in July 1947; that these checks were all in excess of the maximum amount of weekly benefits provided by the Minnesota

employment and security law; that it appeared that in 1946 employer had similarly paid vacation allowances to its employes and that upon representation of representatives of the union and in view of the fact that the production of the company had got off to a late start and had been interrupted because of lack of materials the company had agreed to dispense with the vacation shutdown and had paid the workers the vacation allowance nevertheless as an additional pay check (that year); that in March 1947 employer determined to establish a definite vacation period of one week in the summer of 1947; that the union objected and insisted that the matter should be handled as it had been during the preceding year by the payment of the vacation allowance without a plant shutdown for vacation purposes; that the company did not accede to this request and on or about July 25, 1947, commenced a vacation period and plant shutdown for that purpose covering the working week of July 28 to August 3, 1947; that notices were posted advising the workers of the designated vacation week; that they were further notified to report back to work on the morning of August 4; that the plant was reopened and operations resumed on August 4; and that relators returned to their work on that date.

In its opinion the appeal tribunal said that, since each of the workers had received a vacation allowance for the year 1947 in excess of $20, the maximum benefit amount for any week under the law, they were not entitled to benefits or waiting week credits for the vacation week from July 28 to August 3, 1947, and that their claims must be disallowed, and it so held in its decision, one member of the tribunal dissenting.

An appeal to the director was taken by one of the relators on behalf of himself and the others from the decision of the appeal tribunal. The director in all things affirmed the findings of fact and decision of the appeal tribunal. We quote the director's memorandum as shown in the record as follows:

"The decision of the Appeal Tribunal appears to be well supported by the preponderance of evidence. In addition to the oral

evidence supporting the Appeal Tribunal's decision, Employer's Exhibit G also supports that decision. Exhibit G is a letter dated August 20, 1947, signed by the employer and approved in writing by the United States Steel Workers Local No. 1096. It is said to constitute an amendment to the written agreement between the company and the union (Division's Exhibit 18). The facts surrounding the execution of this agreement to amend, also support the Appeal Tribunal's decision. The offer to amend the printed agreement between the union and the company (Division's Exhibit 18) approved by the union would, of course, be good as between the union and the company. However, the employer and employee cannot enter into any agreement after the fact that will retroactively bind the state. The fact that the letter says '* * * we are willing *to amend* our vacation clause as follows: * * *' is evidence in itself that the printed agreement (Division's Exhibit 18) was the agreement between the parties at all times prior to August 20, 1947. This is further supported by the undisputed evidence that the management announced the planning of the vacation in March at a meeting between the union and the company, and that at that time the union asked the company 'to waive this particular shutdown period and call it a shutdown for getting materials * * *,' and that the company at that time refused to do so and continued such refusal until the execution of Employer's Exhibit G."

It is to secure a review by this court of the decision of the director that relators obtained a writ of certiorari, upon the ground that it is not in conformity with the terms of the Minnesota employment and security law and is unwarranted by the evidence.

The principal issue for consideration by this court is whether the findings of fact and decision of the director are sustained by the evidence.

In reviewing the evidence, we must consider whether the contract of October 1, 1941, between the union and the employer, and certain supplemental agreements made between that date and January 16, 1946, were the ones in force and effect at the time the dispute arose

in 1947, or whether the contract of January 16, 1946, was the only one to be considered in these proceedings. The contract of October 1, 1941, contained a provision that "When an employee desires to forgo his vacation, said vacation shall be taken in the form of a bonus, figured on the basis above set forth." The contract of January 16, 1946, did not contain this provision with reference to vacations.

It appears to us that the only contract we may rightfully consider is the one in effect at the time this dispute arose in 1947, which was the one dated January 16, 1946. Admittedly, that contract did not contain the language used in Article IV(C) of the contract of October 1, 1941, with reference to the vacation or bonus, although there is evidence that the omission was inadvertent. It is true that even though this clause was omitted in the 1946 contract employer waived the omission for that year, after the contract was signed, and paid the bonus in the same manner as in other years since 1941. However, that is not a matter now before us for consideration. The director affirmed the findings and decision of the appeal tribunal that relators were ineligible to receive unemployment compensation for the week of July 28 to August 3, 1947. Our review here is limited to the record to determine whether the decision of the director is in conformity with the terms of the act and warranted by the evidence. Such review must be made in the light most favorable to the findings and decision.

In Chellson v. State Div. of Employment & Security, 214 Minn. 332, 336, 8 N. W. (2d) 42, 45, this court said:

"\* \* \* Where there is any evidence reasonably tending to sustain the findings of the director they will not be disturbed on review. In reviewing an order or determination of an administrative board, the supreme court will go no further than to determine whether the evidence was such that the board might reasonably make the order or determination which it made. State ex rel. Rockwell v. State Board of Education, 213 Minn. 184, 185, 196, 6 N. W. (2d) 251, 143 A. L. R. 503. 1 Dunnell, Dig. & Supp. § 397b, and cases cited."

In a substantially identical statute relating to review of decisions of the industrial commission as the one relating to a review of decisions of the director, this court said in construing that statute in Lading v. City of Duluth, 153 Minn. 464, 469, 190 N. W. 981, 983:

"* * * It is not there [in this court] examined or considered as an original question and with a view of determining the facts; the determination of the facts resting with the trial court or other tribunal to which the matter is committed, and the findings there made, unless clearly, or, as sometimes expressed, manifestly against the evidence, are conclusive and final."

See, also, Richard v. Federal Cartridge Corp. 217 Minn. 136, 14 N. W. (2d) 118.

We hold that under the facts and circumstances of the instant case there is evidence to sustain the decision of the director affirming in all things the findings of fact and decision of the appeal tribunal.

Affirmed.