# AGNES N. HESSLER AND OTHERS v. AMERICAN TELEVISION & RADIO COMPANY. FRANK STARKEY, COMMISSIONER OF DEPARTMENT OF EMPLOYMENT SECURITY, RESPONDENT.

104 N. W. (2d) 876.

August 5, 1960—No. 37,840.

542

*Silver, Goff, Ryan, Wallace & Newcome* and *Allen H. Aaron,* for relator.

*Miles Lord,* Attorney General, and *George C. Gubbins, Jr.,* Assistant Attorney General, for respondent commissioner.

NELSON, JUSTICE.

Certiorari upon relation of American Television & Radio Company, employer, to review a decision of the commissioner of the Minnesota Department of Employment Security affirming a decision of the Appeal Tribunal of said department.

Employer, a manufacturer of vibrators and related equipment at St. Paul, Minnesota, entered into a collective bargaining agreement on May 17, 1956, with the International Union of Electrical, Radio, and Machine Workers, Local 1117, CIO, of St. Paul. A supplemental agreement was executed June 12, 1957, to amend and extend the collective bargaining agreement to April 23, 1958, and it provided for automatic renewal of the agreement from year to year unless 60 days prior to any yearly expiration date a written notice of its desire to terminate or modify the agreement was served by either party on the other. By the terms of the agreement the union local was the agent of its members and acknowledged and accepted responsibility on their behalf for the fulfillment of their obligations under the agreement and pledged full cooperation in carrying out its provisions. The employer recognized the union as the sole collective bargaining agency for all production and maintenance employees in its St. Paul plant.[1] As to job preference and lateral transfers, the union recognized that it was the function of the management of the company to plan, direct, and supervise plant operations including the assignment of employees to occupations, except as specifically outlined in the agreement. Art. IX, § 1(a), of said agreement reads as follows:

"The Union or the employees will not authorize, sanction or finance any strike, picketing, slow-down, or concerted stoppage of work of employees covered by this Agreement during the life of this Agreement unless the Employer has failed to comply with the terms of the Agreement."

---

[1]Mueller v. Chicago & N. W. Ry. Co. 194 Minn. 83, 259 N. W. 798.

The agreement further provides that notice of a party's desire to terminate or modify the agreement shall set forth a list of proposed modifications and that the parties to the agreement shall commence discussions relative to such proposals within 10 days after receipt of such notice, and that such discussions shall be carried on at least twice weekly thereafter until agreement is reached.[2]

The 49 claimants were all employed by the employer and were members of the aforesaid union. They were classified as employees under labor grades B, C, D, D2, and E1 and received an hourly wage ranging from $1.30 to $2.05 an hour. Grades B and C were incentive bonus groups under the contract with average earnings in the months immediately preceding April 1958 of $2.127 per hour, not including fringe benefits valued at 40 cents to 50 cents per hour. Claimants in the other grades were employed on a straight-time basis.

The union, on February 17, 1958, notified the employer that it desired to negotiate contract changes including increases in the hourly wage rates. Meetings for purposes of negotiation were held on March 4, 1958, March 18, 1958, April 18, 1958, and on April 22, 1958, the last before the state labor conciliator. Changes in standards, a proposed union shop, wage increases, and changes in seniority provisions were discussed. On April 22, 1958, the union specified and submitted as acceptable an increase of 6 cents an hour in all wages. At first the employer offered no counterproposal but later proposed a 15-cent wage cut for all of its employees. This counterproposal was later revised by the employer through a written offer on April 21, 1958, of a 7½-cent cut for labor grade B and 3½ cents for labor grade C. Neither union nor employer accepted the other's proposal, and the agreement expired on April 23, 1958.

During the period commencing April 21, 1958, and ending April 25, 1958, 22 of the claimants operating in grades B and C undertook a "slowdown" in their production. In employer's judgment the other claimants also slowed down their production, but no documentation thereon was produced. Employer notified all claimants in writing April

---

[2]Of course, we need cite no authority for the statement that a labor union does not contract as an agent of the employer.

25, 1958, that, because of the "slowdown" and high costs, the base rate of employees in grades B and C would be reduced 7½ cents and 3½ cents an hour, respectively, effective April 28, 1958. On April 28, 1958, 33 of the 39 grade B and C claimants appeared on the employer's premises before 8 a. m. and signed a hand-printed notice directed to employer which read as follows:

"Because of the notice you handed us Friday, stating that effective Apr. 28 1958 you are reducing our base rates 3½ ¢ per hour & 7½ ¢ per hour we the following refuse to work for you and American Television and Radio Co.

"Another reason Mr. Goffstein, is because our standards have been raised and our rates have been cut, unjustifiably." (33 signatures were attached.)

These claimants then visited the union hall, remained for a short interval, and then proceeded to the local employment office of the Minnesota Department of Employment Security where they filed claims for unemployment benefits and registered for work. The additional 16 claimants who did not execute the notice to relator later left their employment for the reasons expressed in the notice. Ten of these claimants were employed in straight-time categories. They were transferred by the company on April 29, 1958, and May 8, 1958, into labor grade B. Five of these 10 people left the employ of the company on April 29, 1958, rather than be transferred. The other five employees left on May 8, 1958, for the same reason.

No strike was ever announced by the union before or after the claimants quit. Grade B and C claimants did not report back for work after April 25, 1958. No claim was ever made by any claimant, so far as the record discloses, that their activities constituted a strike.

The record indicates that representatives of the union and the employer met on April 30, 1958, in the office of the Federal Labor Conciliator and on June 12, 1958, in the office of Robert J. Larson, a company representative. At these meetings the union represented all the claimants who had quit and proposed an increase of 6 cents an hour. At both meetings employer made a proposal to rehire a number of the claimants on a selective basis as new employees without wage

reduction if they would apply for reemployment. An alternative offer to rehire all the claimants as new employees at a 15-cent reduction in their hourly scale was also made at the meeting on June 12. However, under all employer's proposals after April 28, 1958, the claimants were to be hired only as new employees and prior seniority was not to be retained. Claimants and employer failed to come to any agreement and no new contract was executed between April 28 and the time the Appeal Tribunal heard the case.

The Appeal Tribunal made findings of fact and determined that:

"* * * on April 28, 1958, April 29, 1958, and May 8, 1958, claimants left their employment because of a strike resulting from a labor dispute in progress at the establishment in which they were employed, which labor dispute was in progress from March 4, 1958, to June 12, 1958, and claimants shall be disqualified for benefits during said period.

"* * * at the conclusion of the labor dispute on June 12, 1958, the employer discharged claimants from their employment for reasons other than misconduct; that claimants shall not be disqualified for benefits subsequent to June 12, 1958; and that benefits paid, if any, to the claimants after June 12, 1958, shall be charged to the employer's experience rating account.

"* * * the employer's offer of re-employment on June 12, 1958, does not constitute suitable work for claimants, and claimants therefore refused to accept the same with good cause; that claimants shall not be disqualified for benefits subsequent to June 12, 1958; and benefits paid, if any, after June 12, 1958, shall be charged to the employer's experience rating account."

There were no further meetings between the employer and union following June 12, 1958. The field representative of the union did not undertake to represent claimants after that date. The Appeal Tribunal reasoned that the offers of June 12 to rehire claimants as new employees did not propose conditions of employment that compared favorably with those prevailing for similar work in the locality.

Claimants and employer filed separate appeals from the decision of

the Appeal Tribunal. After employer's appeal was heard, the commissioner affirmed the decision of the Appeal Tribunal and employer thereupon by certiorari brought the matter before this court for review.

Claimants' appeal from the decision of the Appeal Tribunal shows clearly that they have never contended that a strike existed. They appealed from the decision "insofar as said decision determined that said Claimants-Respondents should be disqualified for benefits during the period from April 29, 1958 and May 8, 1958 because of a strike resulting from a labor dispute in progress at the establishment in which they were employed."

Employer assigns as error findings (1) that there was a strike coupled with a labor dispute in existence at employer's premises; (2) that said strike terminated June 12, 1958; (3) that employer discharged claimants and that employer's experience-rating account should be charged for benefits paid to claimants after June 12, 1958; (4) that employer's offers of reemployment of June 12, 1958, present a legal basis for charging employer's experience-rating account for benefits from and after that date; and (5) that employer's offers of reemployment to claimants were not offers of suitable work. Employer contends also that the department's denial of employer's request for leave to present additional evidence before an Appeal Tribunal was arbitrary and was an abuse of discretion since employer's unrebutted application to present such evidence indicated that the strike and labor dispute, if any ever existed, concluded 6 months after the termination date selected by the Department of Employment Security.[3]

The language in M. S. A. 268.09 which governs the instant case reads:

---

[3]See State of Minnesota, Department of Employment Security, Regulation 23(c) 5(aa), which provides in part:

"The Commissioner in his discretion may, prior to or upon the hearing of an appeal before him, or upon application and proper showing made, set aside the findings of fact and decision of the appeal tribunal and remand any matter to the appeal tribunal for the taking of such additional evidence as the Commissioner may deem necessary in order to ascertain the substantial rights of the parties to the appeal."

"An individual shall be disqualified for benefits:

"(1) If such individual voluntarily and without good cause attributable to the employer discontinued his employment with such employer * * *."

Also see, §§ 268.09, subd. 1(6), and 179.01, subds. 7 and 8.

Whenever the facts are such that this subdivision governs, the question arises whether a discontinuance of employment was voluntary and without good cause attributable to the employer.

The Appeal Tribunal in the instant case attempted to resolve the following questions: (1) Whether the action of employer on April 25, 1958, constituted a lockout; (2) whether the claimants' leaving on April 28, 1958, and their action thereafter constituted a strike because of a labor dispute; (3) whether employer's determination that claimants were no longer its employees after April 28, 1958, when they served their printed notice of refusal to work, operated as a discharge of claimants for reasons other than misconduct; and (4) whether claimants' refusal of reemployment as new employees was a refusal of suitable employment, and, if so, whether that refusal was with good cause.

Under our Employment Security Act employees cannot receive benefits when they strike, but they are not to be penalized by denial of benefits when the employer undertakes a lockout. § 268.09, subd. 1(6). The law is clear that in order to determine whether claimants have qualified for benefits the Appeal Tribunal need merely determine whether a strike, lockout, or labor dispute exists without deciding the merits of the dispute. The reasons given by the Appeal Tribunal for its decision indicate that it concluded that none of the terms laid down by employer were so unreasonable that claimants had no alternative but to leave, so the action of the employer on April 25, 1958, did not constitute a lockout; and that although employer at no time after April 28, 1958, specifically stated that it was discharging claimants, on April 30, 1958, and in correspondence and negotiations up to June 12, 1958, it did take the position that claimants were no longer its employees, specifying that they would have to be rehired rather than reinstated.

Neither the union representative nor the claimants have ever con-

tended that they were discharged. They appear to have maintained at all times that their action was a final quitting of employment by their own choice and of their own free will. In other words, the claimants supplied the fault and, without good cause attributable to employer, discontinued their employment. We are unable to find that claimants' exercise of their own free choice on April 28, 1958, in their refusal to work and in their immediate filing for unemployment benefits and registration for work made them strikers against their will under the law. They had the right to quit, and they had the right to take the risk that the quitting of their employment would be considered their own fault. Certainly the modest pay decreases announced on April 25, 1958, by employer were not so harsh as to constitute a lockout, as the Appeal Tribunal found, so the resulting unemployment was voluntarily brought on by claimants without just cause attributable to employer. The Appeal Tribunal's statement that "Since none of the terms laid down were so unreasonable that claimants had no alternative but to leave, their concerted refusal to work on April 28, 1958, was then a strike under the law" is inconsistent with the entire record on this review. We think the refusal of the department to grant employer's application to the commissioner for leave to present additional evidence to the Appeal Tribunal, especially in view of the fact that the application informed the department that a new contract was negotiated in January 1959, constituted an abuse of discretion.

Reading the Appeal Tribunal's entire findings of fact and reasons for decision leads to the conclusion that the Appeal Tribunal, in spite of finding that a strike existed, nevertheless, held that all the claimants, in initially refusing to work for the employer, discontinued their employment without good cause attributable to the employer, and the Appeal Tribunal was upheld by the commissioner. We think it clear that the claimants were not victims of involuntary unemployment within the meaning of § 268.03 and furthermore that the modest wage cut tendered by the employer, amounting to approximately 4 percent in one category of employment and 2 percent in another, did not constitute a lockout or render it impossible for the employees to continue on the job. Neither was there any basis for a determination that em-

ployer's offers of reemployment on June 12, 1958, did not constitute suitable work so that the department was justified in finding and determining that the benefits paid, if any, after June 12, 1958, shall be charged to the employer's experience-rating account.[4]

An examination of c. 268 discloses no provision sustaining the position that an employee's quitting because of a wage cut, however small, is without fault on his part and entitles him to draw unemployment benefits chargeable to his employer's experience-rating account.

It might be well to observe at this point that neither § 268.09, subd. 1(6), nor any other provision of the Employment Security Act authorizes the department to evaluate the merits of a labor dispute. If a labor dispute is in fact in existence, its duration is to be gauged by the time it takes for the management and the union to ultimately make an agreement. In considering its statute the Connecticut court in Almada v. Administrator, 137 Conn. 380, 386, 77 A. (2d) 765, 769, commented:

"Most of the unemployment compensation laws adopted in the various states deny, like ours, benefits when the unemployment or stoppage of work is the result of a labor dispute. This is because it is the purpose of the law to tide persons over periods of involuntary unemployment but not to provide support for them when they are on strike. * * * Accordingly, under the statutes generally, it makes no difference what the merits of the labor dispute are. If the unemployment is the result of a labor dispute, the employees are disqualified for benefits, whether it is the employer or the employees who are at fault. It is not competent for the commissioners or the courts to decide that the employees are not at fault and for that reason award benefits. * * * Benefits are not to be allowed in the nature of a penalty against the employer for making unreasonable demands upon his employees."[5]

---

[4]See, In re Anderson, 39 Wash. (2d) 356, 235 P. (2d) 303; Almada v. Administrator, 137 Conn. 380, 77 A. (2d) 765; Assif v. Administrator, 137 Conn. 393, 77 A. (2d) 772.

[5]See, 49 Yale L. J. 461, 476; 33 Minn. L. Rev. 760, 769. Minnesota provides in effect for blanket labor dispute disqualification. See, § 268.09, subd. 1(6).

The record conclusively establishes that the claimants would not work under the circumstances which the Appeal Tribunal held did not constitute a lockout. Prior to the departure of a majority of claimants from the company's employ, the union was on record as desiring a "substantial wage increase." On April 22, 1958, the old contract having expired, the union proposed that a new contract be signed providing for a 6-cent cost-of-living raise. There is no testimony that the union ever lowered this demand prior to the hearing before the Appeal Tribunal. Under all the various circumstances disclosed by the record, the fact that employer later offered terms less advantageous than those rejected by claimants when they quit their employment certainly cannot be held to constitute a discharge of the claimants at any later date unless there be a showing that at some later date all claimants were willing to work pursuant to the conditions they had previously rejected. Under the circumstances the Appeal Tribunal was not required to determine whether offers of work at a 15-cent or a lesser reduction in wages, coupled with a loss in seniority, were offers of suitable work within the meaning of § 268.09, subd. 1(5), nor to determine whether the conditions offered were less favorable to the individual claimant than those prevailing for similar work in the locality within the meaning of § 268.09, subd. 1(5)(b)(2). The directives are laid down in Berthiaume v. Christgau, 218 Minn. 65, 15 N. W. (2d) 115, and Di Re v. Central Livestock Order Buying Co. 246 Minn. 279, 74 N. W. (2d) 518, as to when and under what circumstances the department may make a determination as to what is suitable work under the statute. Those directives indicate that the Appeal Tribunal would first have to hear evidence on and consider what prospect claimants had of obtaining local work in their customary occupations and in addition thereto hear evidence upon and determine what would have been a reasonable length of time for claimants to have sought and found such employment. No evidence was considered upon either question and no determination made accordingly in the instant case.

The wage decrease made by the employer on April 25, 1958, in the instant case, was not necessarily an offer of unsuitable employment. Any later change in the offer one way or the other would not affect

the present situation since the claimants quit of their own free will and accord, by their own choice, on April 28, 1958. See Matter of Mednick, 270 App. Div. 124, 58 N. Y. S. (2d) 493, and Matter of Heater, 270 App. Div. 311, 59 N. Y. S. (2d) 793, where workers were held in each instance to be disqualified from receiving unemployment benefits where they refused jobs with percentage cuts of about 12 percent and 10 percent, respectively. A loss of seniority with a modest wage cut would not as a matter of arbitrary determination mean that the conditions of the work offer are "substantially less favorable to the individual than those prevailing for similar work in the locality," and that such tender is automatically not "suitable." § 268.09, subd. 1(5)(b)(2). This court has heretofore pointed out that an employee has no inherent right to seniority but only such seniority rights which have been vested by statute or which employee might obtain by contract. Edelstein v. Duluth, M. & I. R. Ry. Co. 225 Minn. 508, 517, 31 N. W. (2d) 465, 470. Here both sides had permitted the bargaining agreement to expire.

The record is clear that no strike was ever announced either before or after the departure of the claimants, and no claim was made by anyone that the claimants were at any time on strike. The record discloses references throughout the testimony by employer, its counsel, the claimants, their counsel, the union representative, and even by the chairman of the Appeal Tribunal characterizing the action of all the claimants as quitting or resigning. The record discloses no references to the contrary. The descriptive terminology "quit" or "resign" or "termination" was used almost exclusively. The term "strike" was not used. No claimant in certifying to the department his reason for leaving the employer used the term "strike." The department itself in its initial determination by the claims deputies made no reference to the existence of a strike. The union representative testified that he performed what he termed to be his duty to advise people who are out of work to file their unemployment compensation claims and register for work; furthermore that as a bargaining representative the union did not feel that it any longer represented those who left the employment, and that the union never proposed reinstatement of any of the claimants after their quitting.

■ This court in Anson v. Fisher Amusement Corp. 254 Minn. 93, 96, 93 N. W. (2d) 815, 818, said:

"Normally, either the employee has voluntarily terminated his employment, in which case no compensation is paid, or the employer has without good cause deprived the employee of his employment, in which case compensation is paid. In each of these cases, 'fault' may be attached to one party or the other, and the granting or denying of compensation is in keeping with impartial justice. That 'fault' is relevant in interpreting the Employment Security Act is evidenced by the italicized portions of the general statement of policy embodied in § 268.03, which reads as follows:

" '*As a guide to the interpretation* and application of sections 268.03 to 268.24, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burdens. This can be provided by *encouraging employers to provide more stable employment* and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state will be promoted by providing, under the police powers of the state for the compulsory setting aside of unemployment reserves to be used for the benefit of persons *unemployed through no fault of their own.*' (Italics supplied.)"

It was made clear by that decision that whether the separation from the employment by the worker is his voluntary or involuntary act is determined not by the immediate cause or motive for the act *but by whether the worker directly or indirectly exercised a free-will choice and control as to the performance or nonperformance of the act. We held that if the act of employment separation was performed by him directly of his own free will, or indirectly by his act of vesting in another*

*discretionary authority to act in his behalf, the ultimate resulting act under the circumstances constitutes a voluntary one which disqualifies him for compensation.* The rule would be the same if an employee acts directly in obedience to a representative control which, by his own choice, he had vested in another as his agent.

■ The record supports employer's contention that the 49 claimants quit of their own choice, not because of a lockout nor because the terms laid down by employer were so unreasonable that the claimants had no alternative but to leave. In view also of the statement in their appeal notice, the determination that a strike existed is clearly inconsistent with the record as a whole. It would appear that if in fact there was a strike prior to June 12, 1958, evidence of later negotiations and the signing of a new contract in January 1959 would, if such facts were made a part of the record, carry the strike and labor dispute through the entire period up to the signing of the new contract— which would, if a strike did in fact exist, deprive claimants of any right to unemployment benefits during such time.

■ The record shows that a stipulation prepared by counsel for employer was submitted to the commissioner on January 30, 1959, by counsel for the claimants with a request that the commissioner advise whether the stipulation would be approved by the department if signed by both parties. The stipulated facts therein made it clear that the claimants without good cause attributable to the employer discontinued their employment. The department would not accept the proposed stipulation once the Appeal Tribunal had acted even if it were signed by both parties. Clearly, if the claimants did in fact quit their employment of their own choice, as their appeal to the commissioner indicates, and if their quitting was without good cause attributable to the employer, then certainly under no circumstances could the employer's experience-rating account be subjected to a charge for benefits paid.

The department's determination that the claimants had been on strike arbitrarily deprived them of the freedom of choice that was theirs when they elected not to continue on the employer's payroll in view of the employer's communication to them of April 25, 1958. In quitting their employment with no announcement of a strike and without a strike vote, and then immediately applying for unemployment

benefits and registering for work at the advice of their union, we think claimants clearly manifested an election to quit their jobs and to take their chances as to whether their departure was with good cause attributable to employer. If workers desire to quit their jobs rather than embark on what might be a protracted strike during which they would draw no unemployment benefits, certainly there is nothing in c. 268 to indicate that they are without the right to exercise their own choice. The record is clear that, while the written notice to quit contained only 33 signatures, the 16 additional claimants who also left did so for the same reason. All claimants promptly filed claims for unemployment benefits and registered for work, and they must have intended thereby to give notice to any and all employers that they were available for immediate employment. They must have purposely so acted, with the hope that they would only have to endure a short period of disqualification even if their former employer should be found not to have been at fault.

The legislature has regarded "fault" as a basic element to be considered in interpreting and applying the Employment Security Act. We said in the Anson case that (254 Minn. 97, 93 N. W. [2d] 818):

"* * * The term 'fault,' as applied to either the employer or the employee, is used in a broad juridical sense and does not necessarily imply a negligent or wrongful act. For example, in one sense the employer should be encouraged to provide more stable employment, and fault attaches to the employer if he does not do so. If the employer fails in this respect, those becoming unemployed are entitled to unemployment compensation. *In another sense, however, the quoted portion shows that the legislature is not concerned with those whose unemployment is their own fault.*" (Italics supplied.)

No claimant herein in certifying to the department his or her reason for leaving the employer used the term "strike." The department itself in its initial termination by claims deputies made no reference to the existence of a strike. The union representative testified that he performed what he thought to be his duty to advise people who are out of work to file for unemployment compensation claims and register for work, and furthermore that as a bargaining representative the union

did not feel that it any longer represented those who left the employment. Neither did the union ever propose reinstatement of any of the claimants after quitting. Under the circumstances, employer was entitled to assume that the mass quitting of the employees, accompanied by no prior notice of strike and no subsequent claim that the workers were on strike, constituted resignations.

If, as in the instant case, claimants quit their employment of their own free choice, that fact alone would leave the employer free to run his business without concern about any rights being thereafter asserted against him by those quitting his employment. If, as the record indicates, claimants quit their employment by their own choice and without just cause attributable to the employer, that fact alone would prevent his experience-rating account from being charged for any benefits received by claimants.

■ The viewpoints of the claimants as they appear in the record must be given the significance that they deserve. In Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 142, 38 N. W. (2d) 223, 230, this court said:

"\* \* \* It is the declared public policy of our state that benefits are intended to extend only to those persons *who are unemployed through no fault of their own.*" (Italics supplied.)

In the same case we said (229 Minn. 151, 38 N. W. [2d] 235):

"\* \* \* In the one case, an employer must determine the advantage of a lockout, knowing that his employes will be eligible for unemployment benefits if they are locked out, *and in the other case the employes or the union representing them must determine whether or not to call a strike, knowing that the employes will thereupon be disqualified.*" (Italics supplied.)

We said in Nordling v. Ford Motor Co. 231 Minn. 68, 76, 42 N. W. (2d) 576, 581, 28 A. L. R. (2d) 272, 279, that:

"It is true that our act contemplates compensation for those who are *unemployed because of no fault of their own.*" (Italics supplied.)

■ This court in Bergseth v. Zinsmaster Baking Co. 252 Minn. 63,

65, 89 N. W. (2d) 172, 174, considered the effect of voluntary leaving of employment as follows:

" 'The voluntary leaving provision disqualifies an individual for benefits upon the concurrence of two factors: *(1) the individual must discontinue his employment voluntarily; and (2) such discontinuance of employment must be without good cause attributable to the employer.* * * * "Voluntarily quitting" means the discontinuing of employment because the employee no longer desires to remain in the relationship of an employee with the employer from whom he has separated.' *'Good cause attributable to the employer' embraces situations where employees, through no fault of their own, leave their employment due to factors or circumstances directly connected therewith."* (Italics supplied.)

In Jackson v. Minneapolis-Honeywell Regulator Co. 234 Minn. 52, 57, 47 N. W. (2d) 449, 452, this court said:

"The act was designed to meet only the evils which follow 'involuntary unemployment,' with benefits to be paid to 'persons unemployed through no fault of their own.' It was not designed to take care of the same evils which might flow from voluntary unemployment."[6]

As to rules of construction pertaining to unemployment laws, see Johnson v. LaGrange Shoe Corp. 244 Minn. 354, 70 N. W. (2d) 335.[7]

The record in the instant case clearly establishes that the claimants

---

[6]See, Ayers v. Nichols, 244 Minn. 375, 381, 70 N. W. (2d) 296, 299; In re Employees of Buffelen Lbr. & Mfg. Co. 32 Wash. (2d) 205, 201 P. (2d) 194.

[7]Cases that pertain to scope of review of administrative orders and determinations are Honeymead Products Co. v. Christgau, 234 Minn. 108, 47 N. W. (2d) 754; Hamlin v. The Coolerator Co. 227 Minn. 437, 35 N. W. (2d) 616; Bowman v. Troy Launderers & Cleaners, Inc. 215 Minn. 226, 9 N. W. (2d) 506; Chellson v. State Div. of Employment and Security, 214 Minn. 332, 8 N. W. (2d) 42; State ex rel. Rockwell v. State Board of Education, 213 Minn. 184, 6 N. W. (2d) 251, 143 A. L. R. 503; State ex rel. Dybdal v. State Securities Comm. 145 Minn. 221, 176 N. W. 759; and cases cited in 1 Dunnell, Dig. (3 ed.) § 397b.

left their jobs voluntarily and without good cause attributable to the employer and will permit of no other conclusion. The department should have proceeded to apply such 3- to 7-week disqualification as it saw fit, bearing in mind that in accordance with § 268.09, subd. 1(3), the employer's experience-rating account was not, under the circumstances disclosed by the record, subject to charge.

This case is therefore remanded for further proceedings and the entry of findings by the commissioner consistent with this opinion.

Remanded.

THOMAS GALLAGHER, JUSTICE (dissenting).

I am of the opinion that an employee who terminates his employment because of notice from his employer that his hourly wage rate is to be reduced to the extent here described cannot be said to have voluntarily and without good cause attributable to his employer discontinued such employment so as to be disqualified for benefits under the provisions of M. S. A. 268.09. Likewise, I believe that a refusal to accept an offer of reemployment at a substantial wage reduction and without previous seniority does not constitute a refusal to accept suitable work when offered as prescribed by § 268.09, subd. 1(5).

MR. JUSTICE MURPHY took no part in the consideration or decision of this case.

MR. JUSTICE LOEVINGER, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.